**In the Matter of American Training Services, Inc., Debtor.**

**AMERICAN TRAINING SERVICES, INC., Debtor-in-Possession, Appellant,**

v.

**The VETERANS ADMINISTRATION, an agency of the United States Government, and the Department of Education, State of New Jersey, Division of Vocational Education and Training, Appellees.**

No. B–76–1562.

United States District Court, D. New Jersey.

June 28, 1977.

Archer, Greiner & Read, Haddonfield, N. J., by A. Fred Ruttenberg, Frank R. Demmerly, Jr., Haddonfield, N. J. (On the Brief), for appellant.

U. S. Atty. Jonathan Goldstein by Susan P. Engelman, Newark, N. J., for appellee Veterans Administration.

## OPINION

GERRY, District Judge.

This action concerns the applicability of 38 U.S.C. § 3101(a) (1970), and the amendment thereto in Pub.L. 94–502, 90 Stat. 2405 (Oct. 15, 1976), to certain preexisting practices for payment of veterans' educational benefits.

Appellant American Training Services, Inc. [ATS] is a private vocational training school which sought, as debtor in proceedings for an arrangement under Chapter XI of the Bankruptcy Act, an order in the Bankruptcy Court of this district to enjoin the United States Veterans Administration

[VA] and the New Jersey Department of Education from refusing to continue to pay VA educational benefits on behalf of eligible ATS students who had entered into certain tuition funding arrangements with ATS. Under these arrangements, the student-veterans agreed that their VA educational benefits checks would be sent directly to ATS in the students' names, and they also granted to ATS the power to directly negotiate these checks. The VA refused to make payment under this tuition arrangement pursuant to new regulations effective November 30, 1976, discussed *infra*.

The court below, the Hon. William Lipkin, Bankruptcy Judge, after hearing testimony and reviewing the evidence, denied the preliminary injunctive relief and dismissed the complaint, finding that this arrangement constituted an unlawful assignment of benefits, prohibited by § 701 of Pub.L. 94–502, 90 Stat. 2405 (Oct. 15, 1976), *amending* 38 U.S.C. § 3101(a) (1970). This amendment was held to apply retroactively to bar payment under the previously-obtained ATS powers-of-attorney to receive and negotiate the VA benefits checks.[1] Judge Lipkin also held that retroactive application of the amended statute did not violate the Fifth Amendment as a taking of an ATS property interest without just compensation.[2]

ATS has timely filed its appeal to this court. Pursuant to Bankruptcy Rule 805, ATS requested that this court stay the operation of the bankruptcy court's order pending appeal by restraining the VA from mailing checks directly to the students. This court denied ATS's motion for a stay on February 23, 1977.[3]

---

1. *In the Matter of American Training Services, Debtor*, No. B–76–1562 (D.N.J. Bankruptcy, opinion filed Dec. 27, 1976), hereinafter cited as "Op."

2. Op. at 9–11.

3. Bankruptcy Rule 805 vests "the widest possible latitude and discretion in granting or denying stays on appeal to the district judge." 13 *Collier on Bankruptcy* (14th ed. 1971) ¶ 805.05. In bankruptcy appeals, "there shall be no such thing as a right to a stay, even with bond posted." *Id.* The stay pending appeal was

denied because the granting of the requested relief *pendente lite* would have gone beyond preserving the status quo "upon such terms as will protect the rights of all parties in interest." Rule 805.

In the instant case, where the appellant sought injunctive relief pending appeal which was explicitly denied below, the burden on the appellant must be greater than in the case of a normal stay pending appeal, *see Virginia Petroleum Jobbers Ass'n v. FPC*, 104 U.S.App.D.C.

For the reasons which follow, the order of the bankruptcy court will be affirmed, and the appeal will be dismissed.[3a]

## I. FACTUAL SUMMARY

The bankruptcy court found that American Training Services is engaged in the business of furnishing instruction in driving and handling heavy equipment, and many ATS students are veterans who are eligible for educational assistance benefits from the Veterans Administration.

Upon enrollment, ATS did not require prepayment of tuition, but instead it had the veteran-students designate the ATS address as the address to which the VA educational benefits checks should be sent. These students also executed a power of attorney form in favor of ATS permitting it to endorse and negotiate the students' VA checks when received and to apply the proceeds toward tuition. [These procedures are hereafter referred to as the "tuition funding arrangement."] The bankruptcy court found that ATS instituted this procedure to protect itself from non-payment by veterans for educational instruction received. Such non-payment was found in the past to be as high as 60 to 70 percent of the tuition owed by the veterans.

Appellant ATS urges that the designation of the address and the execution of the power of attorney served two purposes: first, a veteran-student could enroll in an ATS course without having to make prepayment of tuition; second, ATS was thereby given a "security interest" which secured it from loss should a veteran lack the funds or refuse to pay his tuition.

After ATS filed its Chapter XI petition in bankruptcy court, it also filed a complaint against the Veterans Administration. During the course of settlement negotiations to achieve a continuation of state and federal approval of ATS's educational courses, ATS agreed to complete the train-out of students enrolled prior to August 16, 1976, but to enroll no veterans as new students after that date. Appellant ATS urges that as a result of these negotiations, a settlement agreement was reached whereby the VA and ATS agreed that the preexisting tuition financing procedures could continue throughout the term of the agreement.

The VA informed ATS on November 4, 1976, that pursuant to Pub.L. 94–502, *amending* 38 U.S.C. § 3101(a) (1970), no benefits checks for enrolled veterans would be paid out unless ATS certified that it holds no power of attorney authorization to negotiate VA educational assistance checks as of December 1, 1976. The effect of the VA's new policy was to prohibit the execution of the existing tuition funding arrangements for direct ATS receipt and negotiation of checks.[4] ATS would continue, of course, to have a direct remedy against any previously enrolled student who fails to pay his tuition obligations, so long as no VA benefits check is mailed to, or negotiated by, ATS.

ATS filed the action below on November 30, 1976, seeking to enjoin the VA's refusal to pay benefits to or on account of previously enrolled students who had entered into such a tuition funding arrangement prior to the effective date of the amended statute and guidelines.

## II. JURISDICTION AND SCOPE OF REVIEW

The VA urges that the bankruptcy court lacked subject matter jurisdiction to entertain the request for relief. Although the basis of its jurisdiction is not articulated in its opinion, the bankruptcy court had power as a court in equity to adjudicate this dispute. A bankruptcy court is a court in equity having all equitable powers unless otherwise provided by the

---

106, 259 F.2d 921 (1958). Finding that the party seeking the stay failed to make a sufficient showing that it was likely to prevail on the merits of its appeal, and finding further that the stay if granted might offend the public interest implicit in the various veterans bene-

fits statutes, this court denied the stay pending appeal.

**3a.** No appeal is taken against the N.J. Dept. of Educ., defendant below.

**4.** See n. 7a *infra* and accompanying text.

Bankruptcy Act, 11 U.S.C. § 1 *et seq.,* *Young v. Higbee Co.,* 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945); *American United Mut. Life Ins. Co. v. City of Avon Park,* 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940).

The power, where appropriate, to enjoin conduct which impairs property, tangible or not, within the estate of the debtor is implicit in Section 2a(15) of the Bankruptcy Act, 11 U.S.C. § 11(a)(15) (1970). A debtor under Chapter XI, Arrangements, may obtain equitable relief to enjoin or to stay certain suits pending against the debtor, under Section 314 of the Act, 11 U.S.C. § 714 (1970). Equitable relief in excess of the limited scope of Section 314 of the Act is also available to the debtor, however, insofar as such relief derives from Section 2a(15) and the general equity powers of the court of bankruptcy. *See 8 Collier on Bankruptcy* (14th ed.) ¶ 3.23[1]; *see also Continental Illinois Nat. Bank & Trust Co. v. Chicago, R.I. & P. Ry. Co.,* 294 U.S. 648, 675, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

Although it is to be remembered that "Congress did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate," *Callaway v. Benton,* 336 U.S. 132, 142, 69 S.Ct. 435, 441, 93 L.Ed. 553 (1949), there is no demonstration that the controversy involving the debtor's alleged property interest in the present matter either lies outside of, or is merely tangential to, the ATS estate. Indeed, ATS's purported security interest in the tuition funding arrangement appears to be a major asset at the heart of its estate; *cf. In re Dolly Madison Industries, Inc.,* 504 F.2d 499, 502–504 (3d Cir. 1974). Where in the instant case the debtor alleges the impairment of its purported security interest due to the VA's refusal to honor the preexisting procedure for direct payment for services already rendered, to the substantial detriment of the debtor's estate, in interference with the object of effecting an arrangement, the bankruptcy court is not without power to do equity by adjudicating such a dispute. Finally, inasmuch as the debtor's alleged security interest is arguably "property," *Security First Nat'l Bank v. Rindge Land & Navigation Co.,* 85 F.2d 557 (9th Cir.), *cert. denied,* 300 U.S. 686, 57 S.Ct. 430, 81 L.Ed. 888 (1936), which is within the debtor's estate, the bankruptcy court had jurisdiction to decide the alleged rights of ATS and to consider equitable remedies to avoid impairment of this property interest, 11 U.S.C. § 711 (1970).

Likewise, jurisdiction to review the action of the Veterans Administration in prohibiting use of the tuition funding arrangement with respect to previously-enrolled veteran beneficiaries was not foreclosed by the non-reviewability clause of 38 U.S.C. § 211(a) (1970),[5] insofar as the plaintiff alleged the unconstitutionality of the congressional decision to amend Section 3101(a) in a manner purportedly depriving petitioner of a property interest without due process. *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Hernandez v. Veterans Administration,* 415 U.S. 391, 94 S.Ct. 1177, 39 L.Ed.2d 412 (1974). "Such challenges obviously do not contravene the purposes of the no-review clause, for they cannot be expected to burden the courts by their volume, nor do they involve technical considerations of Veterans Administration policy," as opposed to individualized challenges to denials of benefits which are prohibited by the no-review clause. *Johnson v. Robison, supra,* 415 U.S. at 373, 94 S.Ct. at 1169. Jurisdiction over petitioner's constitutional challenge to a decision of Congress is not foreclosed. *Id.* 367, 94 S.Ct. 1160.

This court has jurisdiction to hear this appeal from the order of dismissal entered below, 11 U.S.C. § 11(a)(10) (1970), and this court "shall accept the referee's findings of fact unless they are clearly erroneous, and

---

5. 38 U.S.C. § 211(a) (1970) provides with certain exceptions not here relevant, that

the decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans and their depend-ents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.

shall give due regard to the opportunity of the referee to judge the credibility of the witnesses." Bankruptcy Rule 810.

## III. INTERPRETING 38 U.S.C. § 3101(a) (1970)

■ Appellant ATS argues that the procedure whereby an eligible veteran arranges to have his benefits check sent by the VA to an address at ATS which holds a power of attorney authorization from the student to negotiate the student's check constitutes a security interest and is not an assignment prohibited by 38 U.S.C. § 3101(a) (1970) prior to amendment. Secondly, ATS argues that the October 15, 1976, amendment to that statute, contained in § 701 of the Veterans Education and Employment Assistance Act of 1976, Pub.L. 94–502, 90 Stat. 2405, 38 U.S.C.A. § 3101(a) (Supp.1977), which concededly prohibits such an arrangement entered into after December 1, 1976, may not constitutionally be applied retroactively to prohibit the tuition funding arrangement at issue in this case.

■ For the reasons discussed below, this court is persuaded that the ATS tuition arrangements with eligible veteran-students were prohibited by 38 U.S.C. § 3101(a) (1970) even prior to amendment, and that principles of equitable estoppel are unavailable to ATS in this case. It will be unnecessary, therefore, to reach the constitutional issues concerning retroactive statutory application which were the basis of the bankruptcy court's decision below. The correct result of the bankruptcy court, even though based upon a ground which is inappropriate or unnecessary to the decision, will be affirmed. *See Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937); *Parks v. "Mr. Ford,"* 556 F.2d 132, at 142 n. 13. (3d Cir., filed April 4, 1977).

**6.** 38 U.S.C. § 3101(a) (1970) also provides that claims by the United States are exempt from the application of this statute, and certain assignments of life insurance and servicemen's indemnity benefits are not prohibited.

**7.** § 701 of the Veterans Education and Employment Assistance Act of 1976, Pub.L. 94–502, 90 Stat. 2405 (Oct. 15, 1976), codified at 38 U.S. C.A. § 3101(a) (Supp.1977).

## A. *Statutory Scheme*

Prior to its amendment, 38 U.S.C. § 3101(a) (1970) read in relevant part:[6]

Payments of benefits due or to become due under any law administered by the Veterans' Administration shall not be assignable except to the extent specifically authorized by law, and such payments made to, or on account of, a beneficiary shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary.

The VA contends that power of ATS to receive and negotiate the benefits checks of the veteran-students constitutes an assignment, prohibited by this subsection.

The 1976 amendment to Subsection 3101(a) added the following language specifically prohibiting the instant tuition arrangements:[7]

For purposes of this subsection, in any case where a payee of an educational assistance allowance has designated the address of an attorney-in-fact as the payee's address for the purpose of receiving his or her benefit check and has also executed a power of attorney giving the attorney-in-fact authority to negotiate such benefit check, such action shall be deemed to be an assignment and is prohibited.

Guidelines issued by the VA in DVB Circular 20–76–84, App. D, effective November 30, 1976, prohibit correspondence schools from negotiating the benefit check of any student under any power-of-attorney arrangement previously entered into.[7a]

**7a.** DVB Circular 20–76–84, App. D (Oct. 29, 1976) provides in part as follows:

1. *PURPOSE.* This appendix provides instructions for implementing the provision of PL 94–502 which prohibits the assignment of educational benefit payments.

2. *GENERAL.* PL 94–502 amends 38 U.S.C. 3101(a) effective December 1, 1976, to prohibit the assignment of educational assistance

The legislative history of the amendment, appearing at 1976 *U.S. Code Cong. & Admin.News* pp. 5369–5373, discloses the congressional opinion that such an assignment was prohibited by prior law and tradition, and that the 1976 amendment was enacted merely to clarify existing law and to correct a misleading 1972 Veterans Administration policy decision which "abruptly and inexplicably reversed the prior opinions of the General Counsel" in contravention of prior legislative intent. *Id.* at 5797–98.

A similar problem of statutory interpretation, where Congress enacted legislation to cure a misinterpretation regarding reviewability of veterans benefits decisions, confronted the court in *De Rodulfa v. United States,* 149 U.S.App.D.C. 154, 461 F.2d 1240, *cert. denied,* 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972). In its extensive opinion, the court drew extensively from the legislative history of a 1970 amendment to the nonreviewability clause of 38 U.S.C. § 211(a) (1970),[7b] by which Congress indicated its belief that the unamended statute clearly precluded judicial review of all administrative forfeitures of previously awarded noncontractual benefits. In order to counteract a line of judicial decisions permitting such review, Congress passed a clarifying amendment to give the statute "a meaning Congress felt it should always have had." *Id.* at 1249. The court accepted this *post hoc* indication of congressional intent and applied the congressional interpre-

tation to preexisting actions. The *De Rodulfa* court thus assigned great weight to the congressional statements of the meaning of the pre-amendment statute.

Before comparable weight could be given to the 1976 statements of Congress in the instant case, however, it must be noted that *De Rodulfa* concerned congressional expressions regarding judicial competence and power to review VA decisions, subject to the established principle that where Congress creates a right in individuals against the United States, it is free to restrict the jurisdiction of the courts over the accompanying remedy, or even to withdraw it entirely. *Id.* at 1256–1258. As *De Rodulfa* pointed out, and unlike the instant action, there was no question of the obligations of a preexisting contract between the plaintiff and the VA. *Id.* at 1257.

For these reasons, the pronouncements by the 1976 Congress regarding the meaning of Section 3101(a) prior to amendment, while not irrelevant, are also not entitled to controlling weight in assessing the meaning of the prior law. Pursuant to our independent review of the preamendment statutory scheme, however, this court is persuaded that the ATS tuition arrangements were precisely the type of assignment, constituting interference with direct payment of veterans benefits, which Section 3101(a) has always prohibited. ATS's assertion of the right to compel the continued VA recognition and approval of such prior arrange-

checks through the practice of a payee designating the address of an attorney-in-fact (a school or school representative in this context) as the payee's check mailing address, and also executing a power of attorney authorizing the attorney-in-fact to negotiate Veterans Administration educational benefit checks. No school may have authority to negotiate VA educational benefit checks or direct or indirect access to the proceeds of such checks through devices such as post office box addresses or sales offices of the school which serve as students' mailing addresses, or bank accounts jointly held with payees to which benefit checks are mailed. All educational benefit checks must be negotiated by the veteran or eligible person.

 a. . . . All correspondence schools will also be notified that if a school address is shown as the student's mailing address on any currently running awards, the school

must submit a certification that effective December 1, 1976, they will not accept a power of attorney to cash VA educational benefit checks, and they will not exercise check-negotiating authority under any power of attorney previously accepted.

 b. All schools, other than correspondence schools, will be informed that no enrollments or reenrollments using the school's address or a post office box or sales office address of the school as the student's address will be processed on or after December 1, 1976, unless the school certifies that it holds no power of attorney to negotiate VA benefit checks and it does not have direct or indirect access to the proceeds of such checks other than by direct payment by the payee thereof . . . . .

**7b.** *See* note 5 *supra* and accompanying text.

ments lacks legal justification. *See United Systems, Inc. v. Roudebush*, Civil No. 76–2203 (D.D.C., filed Jan. 17, 1977), slip op. at 8, 10; *but see Los Angeles Community College District v. Roudebush*, No. CV–77–0097–LEW (C.D.Cal., filed Feb. 15, 1977), slip op. at 13–14.

The general statutory scheme of payments militates against ATS's position. Various VA benefits statutes provided that an educational assistance payment shall be made by the VA directly "to each eligible veteran who is pursuing a program of education under this chapter," 38 U.S.C. § 1681 (1970);[8] *see also* 38 U.S.C.A. § 1780(a) (1976). Such benefits checks must be mailed "to the payee thereof at his last known address," 38 U.S.C. § 3020 (1970).

In the single instance when Congress intended to allow the educational institution to receive a veteran's benefit check, it used clear language and granted only a narrowly-defined authority to the school. The sole instance permitting such mailing to the school is when a student requests an advance payment prior to the start of instruction under 38 U.S.C. § 1780(d)(5) (Supp.II, 1972). This subsection provides that an advance payment, drawn only in favor of the eligible student, can be sent to the institution for temporary care and delivery to the veteran upon registration at the institution. No provision allows the institution to negotiate the check. Under this carefully-controlled procedure, the school also has the duty to certify to the VA that it has made this delivery, *id.* § 1780(d)(6). It is highly unlikely that a Congress so concerned with circumscribing the procedure by which an educational institution may have temporary custody of a veteran's check could simultaneously have intended to permit the institution, through private arrangement with the

veteran, to not only receive but also negotiate the benefit check.

Congress has exempted veterans' benefits from creditor.actions since 1873.[8a] The prohibition of any assignment of veterans' benefits is also hardly new, because as early as 1883 Congress provided in R.S. 57, § 4745:

> Any pledge, mortgage, sale, assignment or transfer of any right, claim or interest in any pension which has been, or may hereafter be granted, shall be void and of no effect . . . .

This statute also provided, *inter alia*, that "any person . . . who shall hold [a pension interest] as collateral security for any debt . . . shall be guilty of a misdemeanor." Appellant ATS argues that, by dropping reference to security interests in subsequent amendments ultimately including Section 3101(a), Congress intended to permit the instant tuition arrangement. This court does not agree. Congress' intent in eliminating criminal liability for such conduct does not render the arrangement any less void if otherwise prohibited by the statute's sensible interpretation.

■ The protection of veterans' rights to be exempt from creditor claims against benefits must be liberally construed to protect funds granted by Congress for the maintenance and support of the eligible veterans, according to *Lawrence v. Shaw*, 300 U.S. 245, 250, 57 S.Ct. 443, 81 L.Ed. 623 (1937) and *Porter v. Aetna Casualty & Surety Co.*, 370 U.S. 159, 162, 82 S.Ct. 1231, 8 L.Ed.2d 407 (1962). The monies which are paid are preserved by statute for the sole use of the veteran, "regardless of the technicalities of title and other formalities." *Porter, supra.* Any legal formulation or arrangement which could dilute or evade

---

**8.** The regulations at 38 C.F.R. § 21.4139(a) (1976) provide that "[p]ayment will be made to the veteran or to a duly appointed fiduciary. Direct payment to the veteran may be made notwithstanding his or her minority." The term "duly appointed fiduciary" is undefined, but it would not include payment to the school directly unless the school were acting in a fiduciary capacity to protect the interests of the

veteran, rather than in its own self-interest. Moreover, "duly appointed" would imply that the fact of the fiduciary's power to receive the veteran's check must be made known to the VA as payor, a condition not met herein nor elsewhere provided for in the regulations.

**8a.** Act of Mar. 3, 1873, R.S. § 4747 (1878).

the literal and historical thrust of the statute's protective provisions must be viewed with appropriate caution.

### B. *Prior VA Interpretations*

Prior to 1972, the Veterans Administration developed a consistent interpretation that Subsection 3101(a) prohibited the power of attorney arrangement. A brief period of uncertainty due to a partial VA turnabout was ended by the 1976 amendment, *supra.* The VA's General Counsel in 1958 had held that this subsection's precursor prohibited any authorization to make a debt payable from veterans benefits, stating:

> A written authorization given by a veteran to pay for [sic: from] benefits payable to him a private debt would, if given effect, virtually make of the VA a collection agency and would partake of the nature of an assignment prohibited by section 3, Public Law 262, 74th Congress, 38 U.S.C., § 454(a). Such a written authorization would not be honored.[9]

The Comptroller General amplified upon that interpretation the following year, stating in a letter opinion that "a procedure for payment of education and training allowances 'to an agent or attorney-in-fact' . . . would be in contravention of the purpose and intent of [several statutes including Section 3101] . . . .. The plan obviously is designed for the primary benefit and convenience of the school and might prove detrimental to the interest of the veterans." [10]

The arrangement whereby the veteran directs that his benefits check be mailed directly to the institution coupled with execution of a special power of attorney authorizing the school to negotiate the check— the precise type of arrangement at issue in the instant case—was also held to be pro-

hibited by Section 3101 in a 1969 opinion of the VA's General Counsel.[11] This arrangement was prohibited as an "assignment" notwithstanding the fact that, as in the instant case, no single document was presented to the VA in an attempt to secure payment directly to the attorney-in-fact; i. e., the institution.[12]

Appellant ATS relies upon a cryptic VA policy statement issued in 1972, Administrator's Decision, VA No. 993 [hereinafter AD 993],[13] which dealt with the question: "Does the Veterans Administration have the legal authority to refuse payment to an otherwise entitled beneficiary-payee merely because he has attempted to effectuate what might be tantamount to an assignment of his benefits?"

The reasoning employed in AD 993 nearly defies comprehension. First, AD 993 set forth some of the prior interpretations of Section 3101's anti-assignment provisions, discussed above. Second, it proceeded to quote 38 U.S.C. § 3020(a), which provides *inter alia* that benefits checks "shall be transmitted by mail to the payee thereof at his last known address," regarding which the Administrator drew the conclusion:

> We find no legal support in this provision for the Veterans Administration to refuse payment to an otherwise entitled beneficiary-payee merely because he has *attempted* to effectuate what might be tantamount to an assignment of his benefits. To the contrary, it appears to mandate payment to his last known address.[14]

Since nothing in Subsection 3020(a) relates to assignments, it is not surprising that no support for VA nullification of benefits check assignments, "attempted" or otherwise, was found in this provision. On the other hand, AD 993 held that Section 3101

---

**9.** Op. V.A.G.C. 3–58, *quoted in* 1976 *U. S. Code Cong. & Admin. News* p. 5370.

**10.** Op. Compt. Gen. B–105303 (May 29, 1959), *quoted in* 1976 *U. S. Code Cong. & Admin. News* pp. 5370, 5371.

**11.** Op. V.A.G.C. 3–69, *quoted in* 1976 *U. S. Code Cong. & Admin. News* p. 5371.

**12.** *Id.*

**13.** This policy decision was implemented by DVB Circular 20–73–5 (Feb. 6, 1973); AD 993, *supra*, is partially excerpted in 1976 *U. S. Code Cong. & Admin. News* pp. 5371, 5372.

**14.** AD 993, *supra*, at 2 (emphasis in original).

"precludes the Veterans Administration from giving any effect to a purported assignment of VA benefit payments."[15] Did the policy announcement in AD 993 turn upon some inarticulable difference between an "attempted" assignment (against which the VA felt powerless) and a "purported" assignment (which the statute forbids)?

Third, for reasons which are altogether unclear (set forth in the margin),[16] AD 993 appears to say that although any action by a veteran-payee to effect a transfer of his right, title and interest in his anticipated benefit checks "is a nullity," nonetheless the VA will not interfere with or adjudicate precisely this arrangement between the veteran-payee and the third-party assignee.

It must be noted that AD 993 did not state that the power of attorney arrangement for third-party negotiation of benefits checks was allowable under Section 3101. Nowhere did the VA clearly state that such an arrangement was anything but an assignment. It remained clear even after this 1972 statement that the Veterans Administration believed that such an arrangement was tantamount to an assignment in contravention of Section 3101. The VA apparently decided, however, that it was powerless to inquire into any such arrangements, and it was reluctant to curtail the practice among parties to such an assignment.

Faced now with the problem of statutory construction of the anti-assignment provision of 38 U.S.C. § 3101(a) prior to the 1976 amendment, and absent guidance of judicial interpretation of that clause's meaning, the question arises of the due weight to be given to the VA's various interpretations of this statute.

The Supreme Court in *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), held that an administrative interpretation of a complex regulatory scheme is entitled to great deference, "which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."[17] This deference is accorded to an agency which, as in *Udall v. Tallman*, has consistently followed its construction of a new, complex statute in its attempt to set the new regulatory machinery in motion.[18] The Supreme Court reiterated in *Train v. Natural Resources Defense Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), that in the context of a new and complex statute, the administrative agency's construction will be accepted where it is "suffi-

---

**15.** *Id.*

**16.** AD 993, *supra*, reasoned as follows:

Section 3101, *supra*, does two things. It removes the right of assignment of the veteran's benefit and, secondly, it removes his benefits from taxation, levy, and the claims of creditors. The bar against an effective assignment manifestly applies to those who would be the principal parties to an assignment, i. e., the beneficiary-payee, as assignor, and some third person as assignee. Under the force of the statute, any purported action taken by such payee to effect a transfer to a third party of the right, title, and interest in the benefit checks he anticipates receiving, whether in exchange for a valuable consideration or .not, is a nullity insofar as it may have been viewed as a legal assignment. And, any such arrangement between those parties may not be used as a basis to require the Veterans Administration to either draw the check for benefits in favor of the purported assignee or deliver it to him for his retention. Further, nothing set out in section 3101 requires or empowers any affirmative action by the Veterans Administration either to enforce the bar, or adjudicate, or otherwise determine the nature of any such transaction between its beneficiary and a third party or its enforceability at law, with the exception of those cases where the beneficiary is mentally incompetent or a minor and the Veterans Administration has assumed supervision of the fiduciary relationship under which payments are made or where there is an indication of fraud. The rights of the parties under an attempted assignment is a private matter, and one that must be left to private or judicial determination. Manifestly, the prior opinions of the Office of General Counsel construing certain arrangements between beneficiaries and third parties, in relationship to section 3101, must be deemed modified in the light of the foregoing.

**17.** *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

**18.** *Id.; see Power Reactor Co. v. Electricians*, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).

ciently reasonable," [19] even if other interpretations are equally reasonable.

In the instant case, this court is reluctant to grant such great deference to those aspects of the VA's 1972 interpretation in AD 993, *supra*, or its progeny which clouded the agency's long-established anti-assignment policy. The statutory machinery was not new or complex, nor did its interpretation depend upon matters placed within the VA's unique area of expertise. The VA's position in 1972 became ambiguous; the arrangement was tantamount to an assignment and therefore a nullity under Section 3101, yet the agency would not refuse to remit checks to an eligible veteran who may have "attempted" to make such an assignment. This policy was not consistent with the statute, nor was it even internally consistent.

Moreover, the 1972 turnabout was generated in part by the VA's concern for protecting the educational institutions, in view of the consideration given to the difficulties caused by "the impact of today's economic and credit factors" [20] due to the prior strict anti-assignment interpretation. It was impermissible for the VA to consider the financial needs of third-party creditors in the interpretation of a statutory provision in which Congress clearly focused upon protecting veterans by assuring the direct payment of non-assignable benefits to eligible veterans. *See Porter v. Aetna Casualty & Surety Co.*, 370 U.S. 159, 82 S.Ct. 1231, 8 L.Ed.2d 407 (1962).

Thus, the 1972 VA interpretation that power of attorney arrangements were beyond the concern of the anti-assignment clause is not sufficiently reasonable to be accorded great weight by this court. That legal interpretation ignored the realities of the conduct which the statute sought to prohibit, *see NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), and accordingly the VA's 1972 construction was inconsistent with the statute, and it does not support ATS's position in the instant case.

The VA has, of course, retracted its prior erroneous view of Section 3101(a), returning to the pre-1972 construction. The court agrees with the VA's statement in its brief that "[t]he fact that the VA erroneously thought (and stated as such), that it did not have the power to take any action with respect to the anti-assignment clause, did not make appellant's arrangement with the students any more permissible." [21] Nor is the VA's 1972 interpretation in AD 993 entitled to substantial weight in this court's construction of the unamended Section 3101(a).

### C. *Assignment or Security Interest*

For reasons already alluded to, we must also reject ATS's contention that its tuition credit arrangement is a "security interest" which is unaffected by the anti-assignment provision of Section 3101(a) prior to amendment. ATS argues that a valid assignment exists only if a title to the chose in action is transferred to the assignee with notice to the obligor, *Spilka v. South America Managers, Inc.*, 54 N.J. 452, 255 A.2d 755 (1969), to extinguish a debt owed to the assignee. The arrangement *sub judice* is argued to be a security interest, since it does not extinguish the original debt but merely secures faithful performance, relying on *In re Bristol Associates, Inc.*, 369 F.Supp. 1 (E.D.Pa. 1973), *rev'd on other grounds* 505 F.2d 1056 (3d Cir. 1974), and *In re Joseph Kanner Hat Co., Inc.*, 482 F.2d 937, 940–941 (2d Cir. 1973), and other cases.

This security interest argument is apparently raised by ATS for the first time on appeal; but in view of recent conflicting resolutions by other courts considering similar issues, this court will address the issue. A similar "tuition financing arrangement" to collateralize payment of the tuition obligations by power of attorney to receive and negotiate the veteran-student's future benefit payment was held to constitute a "se-

---

**19.** *Train v. NRDC*, 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

**20.** AD 993, *supra*, at 1.

**21.** Br. of Appellee VA at 11.

curity interest" and not an assignment as a matter of law, in *Los Angeles Community College District v. Roudebush*, No. 77–0097–LEW (C.D.Cal., Feb. 15, 1977), slip op. at 13, and hence not prohibited by Section 3101(a) prior to amendment. In *Peace Officer Training Service College v. Roudebush*, No. C 76–2782–CFP (N.D.Cal., Mar. 28, 1977), slip op. at 10, on the other hand, the court rejected the contention that any vested security interest was created by such a tuition arrangement. Similarly, in *United Systems, Inc. v. Roudebush*, No. 76–2203 (D.D.C., Jan. 17, 1977), the court concluded that the educational institution under such an arrangement lacked any property interest sufficient to give it standing to challenge the VA's refusal to honor such an arrangement. Implicitly, the court in *United Systems* found the tuition arrangement to be prohibited by Section 3101(a) even prior to amendment. *Id.*, slip op. at 10, 11.

In the instant case, the evidence does not support ATS's contention. The tuition arrangement whereby ATS directly received and negotiated its students' VA checks was not merely used as a device to secure payment in case of default by the student of his tuition obligation, but it was instead a device to directly accomplish *payment itself*, whether or not the student had first failed to pay. The arrangement created not merely collateral nor security but rather a direct payment of the tuition prior to the veteran's receipt of any proceeds. The testimony of ATS's president showed that the benefits to which the student-veterans were entitled, including correspondence course fees, residential tuition reimbursement, and in some cases a subsistence allowance, were paid by a VA check, payable to the eligible veteran, but actually received and negotiated directly by ATS and credited to the student's account.[22]

**22.** Tr. at 12, 14–16, 21–22.

**23.** The Third Circuit, on review, also assumed throughout its opinion that an *assignment* had created whatever type of security interest ex-

The cases relied upon by ATS are also unhelpful toward demonstrating that the arrangement herein is not tantamount to an assignment. The teaching of *In re Bristol Associates, Inc., supra*, is that a lessor's assignment of a lease and rentals receivable thereunder, as security for the repayment of a loan, created a security interest in the assignee, 369 F.Supp. at 3. In that case, an *assignment* gave rise to a security interest to secure repayment of the loan; nothing suggested that the debtor's creation of a security interest by "assigning" his right to receive rental payments was by any mechanism other than assignment.[23] Likewise, *In re Joseph Kanner Hat Co., supra*, a loan repayment obligation was found to have been secured by assignment of a money claim owed to the assignor; only in the event that the loan were not repaid would the assignment become a source of such payment. Such is not the case herein.

Under the tuition arrangement in the instant case, ATS makes no demand for repayment of the student's loan obligation prior to receipt of the VA checks; the student is not declared in default of the obligation to pay; the checks are negotiated by ATS not because of the students' failure to pay but because this is the agreed mode of payment. In short, the receipt and negotiation of the VA checks does not "secure" the tuition payment—it *constitutes* payment and satisfies the obligation. This is a fundamental aspect of an assignment.

Finally, the very wording of Section 3101(a) militates against the ATS "security interest" construction. The statute plainly prohibited any arrangement which gave rise to any claim of a creditor whether made before or after receipt of benefits by the eligible veteran. The enforcement of any agreement or promise to pay an obligation from anticipated benefits was prohibited, since Section 3101(a) [24] provided not only that "Payments of benefits due *or to become due* . . . shall not be assigna-

isted in the case. *In re Bristol Associates, Inc.*, 505 F.2d 1056 (3d Cir. 1974).

**24.** *See* text accompanying n. 6 *supra*.

ble," but also that "such payments . . shall be exempt from the claim of *creditors,* and shall not be liable to attachment, levy or seizure by or under *any legal or equitable process* whatsoever, either *before* or after receipt by the beneficiary." This statutory exemption of anticipated benefits from the claims of creditors is further proof that the benefit checks may not be pledged to secure payment of the tuition obligation, nor may a creditor such as ATS enforce its claim to any check which has been so pledged for the sake of satisfying the tuition debt.

### D. *Summary*

In summary, we hold that the ATS tuition financing arrangement was prohibited by 38 U.S.C. § 3101(a) (1970) because permitting such direct receipt and negotiation of veterans benefits checks would be inconsistent with the overall statutory scheme of veterans benefits,[25] it is inconsistent with prior VA interpretations of the statute,[26] it can not be justified under the VA's 1972 decision in AD 993, *supra,* insofar as that decision is ambiguous or erroneous,[27] and it is not exempt from the anti-assignment clause by being termed a "security interest."[28] Petitioner ATS therefore had no permissible property interest in its tuition funding arrangement under Section 3101(a), and hence no interest was impaired by the subsequent 1976 amendment and the accompanying VA guidelines.

25. *See* text accompanying nn. 6–8 *supra.*

26. *See* text accompanying nn. 9–12 *supra.*

27. *See* text accompanying nn. 13–21 *supra.*

28. *See* part III.C *supra.*

29. According to the testimony of Mr. Fox for ATS, national and regional officials of the VA indicated during telephone conversations that the use by ATS of the power of attorney arrangement to directly receive and negotiate veterans' checks was not illegal. Tr. at 22.

30. *See* text accompanying nn. 13–21 *supra.*

31. Br. of Appellant ATS at 22.

## IV. EQUITABLE ESTOPPEL

Appellant ATS asserts that the VA should be equitably estopped from refusing to honor prior tuition funding arrangements. ATS assertedly relied upon representations of VA officials who indicated in early 1976 that the tuition arrangements were "perfectly legal."[29] The 1972 policy statement in AD 993, *supra,*[30] was interpreted by ATS to "expressly recognize the validity of tuition security agreements like that entered into between [ATS] and its students."[31] Finally, ATS argues that the VA should not be allowed to modify its alleged settlement agreement compromise, the terms of which purportedly condoned continuation of the direct payment arrangement.[32]

With respect to the alleged settlement agreement, we find that the record does not support the contention of ATS that there was an agreement reached between the VA and ATS to provide for direct payment of educational benefits to ATS.

The court below discussed these settlement negotiations and noted that "there was no indication of change in the [funding] procedure then being followed."[33] The court also noted a letter to ATS dated August 9, 1976, from a Mr. DiStephano, an official of the New Jersey Department of Education, the state approving agency for veterans' courses. This letter confirmed the suspension of approval of various ATS courses for enrollments after August 16, 1976, and it stated: "This suspension does

32. Mr. Fox testified that ATS conceived that the prior funding arrangements would continue during the train-out period through December, 1976. He stated, "When we engaged in the dialogue with the Veterans Administration back in June or July to train-out the students, had there been any indication at all that they would change their policy or reinterpret their policy about paying or allowing us to use the power of attorney on the VA checks, we would have absolutely rejected all of the contracts and not engaged in the train-out of the students, because our prior history had told us that darn close to 70% of those checks we would never see again . . . ." Tr. at 23.

33. Op. at 3.

not affect the educational benefits of those veterans and eligibles previously enrolled."

Nonetheless, the court below found that no contract for instruction or payment existed between the VA and ATS; instead, it found that the relevant contract existed between ATS and its students, that payment by the VA depended upon satisfaction of the mutual conditions of that contract by the school and the eligible veteran, and that no specific agreement existed which would compel direct payment by the VA to ATS.

This court is persuaded that the bankruptcy court's finding of no explicit agreement regarding payment procedures is not clearly erroneous. The focus of the DiStefano letter, and apparently of the negotiations, was upon the suspension of course approval and the phase-out of enrollments. Payment procedures were not mentioned therein, nor is this court directed to evidence that payment procedures were a topic of the settlement negotiations. The VA was not a party to any power of attorney agreement.

Even if the VA made no explicit promise to pay benefits directly to ATS under the tuition arrangement, it is still likely that ATS may have received the distinct impression from conversations with VA officials, together with the ambiguous directive AD 993, *supra*, that its arrangement was not prohibited by Section 3101(a). The court below did not doubt this allegation. This court has held, however, that Section 3101(a) prohibited the arrangement in question, in part III *supra*. Any contrary interpretation by VA officials was erroneous. The question before us is whether the contrary indications by VA officials, upon which ATS allegedly relied to its detriment in providing instruction to veterans without prepayment, should estop the VA from asserting that its officials erred in their prior interpretation of Section 3101(a).

The VA failed from the 1972 publication of AD 993, *supra*, until the publication of new guidelines in DVB Circular 20–76–84, App. D. (October 1976), *supra*, to give clear and accurate guidance to the public regarding the applicability of Section 3101(a) to the various tuition funding arrangements. This serious administrative shortcoming caused confusion among the veterans and educational institutions as well as among those charged with administration of the educational benefits program established by Congress.

■ This court might be tempted to extend to ATS the benefit of the VA's error and confusion by estopping the VA from refusing to honor the direct payment arrangements which ATS obtained from students pursuant to defective guidance from the VA. But we find that estoppel against the Veterans Administration is not warranted by the circumstances of this case. Estoppel is an equitable remedy available against the government where the misconduct of an agency or of its officials acting strictly within the scope of lawful authority threatens to work a serious injustice against a person who has reasonably relied upon such conduct to his detriment. See *Immigration & Naturalization Service v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973); *In re Hooper's Estate*, 359 F.2d 569 (3d Cir. 1966).

■ A governmental agency will not be bound by ordinary errors or omissions in the conduct of its employees because there is generally a prevailing public interest in correcting erroneous interpretations of policy. Neither will the government normally be bound by erroneous advice or by entry into an agreement which is not in accordance with the law. As Judge Maris wrote in *In re Hooper's Estate, supra*, 359 F.2d at 577:

> It is well settled that contracts with agents of the Government must be in strict conformity with the authority conferred [citations omitted]. . . . The Government is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit. *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917); . . . .

**1002**

In that case the Third Circuit held that an erroneous governmental decision to award subsidies for industrial development will not estop the government in an action to recover such funds from the estate of the recipient. Of course, when an officer of the government acts *within* his authority to bind the government in a transaction, the government will be bound to stand behind its *lawful* written agreements in order to prevent manifest injustice. *See, e. g., Walsonavich v. United States,* 335 F.2d 96, 100–101 (3d Cir. 1964).[34]

■ A governmental agency may change its policy in managing a program of statutory benefits, and persons having contact with the program will be bound by the lawful new policy even though relying upon the former interpretation. Thus, in *Denena's Heirs v. Communication Splicing & Engineering Co.,* 474 F.2d 1249, 1250 (3d Cir. 1973), a governmental agency was held to not be estopped from enforcing a new reporting and payment policy for employers in a workmen's compensation insurance program by assessing a penalty for noncompliance, even where the agency's forms still reflected the old policy with which the employer complied.

Furthermore, the Supreme Court has indicated at least a strong reluctance to find equitable estoppel against the government in the absence of "affirmative misconduct" in *Immigration & Naturalization Service v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973). In *Hibi,* a citizen of the Philippines petitioned in 1967 for citizenship under a special statute which conferred this opportunity upon certain aliens who served in the U. S. Armed Forces during World War II. Such a petition was required to be filed by December 31, 1946, but the U. S. Immigration and Naturalization Service failed both to advise Philippine citizens of this special right and to provide a naturalization agent in the Philippines during the limited period of eligibility. The government was held to not be estopped from asserting the statute of limitations under these facts, with the majority stating:

> While the issue of whether "affirmative misconduct" on the part of the Government might estop it from denying citizenship was left open in *Montana v. Kennedy,* 366 U.S. 308, 314, 315 [81 S.Ct. 1336, 6 L.Ed.2d 313] (1961), no conduct of the sort there adverted to was involved here.

*Id.* at 8, 94 S.Ct. at 21. Whether the Supreme Court has engrafted a requirement that affirmative misconduct be shown before estoppel may be found against the government remains unclear; such a fixed

**34.** The cases finding estoppel cited by the appellant such as *United States v. Georgia-Pacific Co.,* 421 F.2d 92 (9th Cir. 1970), and *United States v. Lazy FC Ranch,* 481 F.2d 985 (9th Cir. 1973), generally involved some failure or refusal by the government to keep agreements concerning land which were lawful when made and which would cause particularly harsh consequences to individuals if the government were not estopped from changing its position. In *Georgia-Pacific, supra,* the government attempted to compel specific performance of a contract between itself and a third party but was held to be estopped by a subsequent lawful administrative order, ratified by Congress, upon which the defendant relied, which had the effect of modifying the boundaries within which the contract conveyances were to have been made.

In *Lazy FC Ranch, supra,* partners of a ranch, acting upon the advice and approval of an agent of the U. S. Dept. of Agriculture, entered into Acreage and Conservation Reserve contracts with the government, where the arrangement was lawful when entered into. The government paid funds under its soil bank programs. When one program was terminated, the partners requested termination of their remaining contracts, but the government refused and continued to pay soil bank funds to the partners. When subsequent regulations limited the maximum payment, the government sued the partners to recover the excess payments. The government was held to be estopped from recovering the overpayments due in large part to its wrongful refusal to permit termination of the soil bank contracts.

The situation is quite different in the instant case. Advice or consent by VA officials permitting the tuition arrangement was not lawful in accordance with § 3101(a) when given. The VA's subsequent regulations were not a policy reversal so much as a resolution of ambiguity. Moreover, the government makes no affirmative claim for recovery of tuition paid to ATS under the direct payment arrangement, nor is ATS left without a remedy for the current tuition payments, namely against the students who are bound by contract to pay their tuition to ATS.

requirement may possibly be limited to immigration and other matters where the government is acting as the sovereign rather than proprietarily.[35]

We need not decide whether the *Hibi* affirmative misconduct standard is a prerequisite for equitable estoppel when the government acts in a non-sovereign capacity, because it is apparent that the governmental agency which administers the program of payment of voluntary educational benefits to the nation's veterans, wholly statutory in origin, carries out a uniquely governmental function.[36]

 In any event, no affirmative misconduct by the VA or its officers exists in this case, where the facts indicate that VA officials gave erroneous advice pursuant to an ambiguous policy statement. The VA is not bound by any statements by its officials which may have indicated approval of the tuition funding arrangement for direct payment, since such approval was erroneous

and beyond the scope of authority vested in the VA and its officials by Congress.

This court agrees with the result reached in *Peace Officer Training Service College v. Roudebush*, No. C 76–2782–CFP (N.D.Cal., Mar. 28, 1977), slip op. at 8, wherein the court indicated:

> [T]he Court does not agree that the requisite elements of estoppel exist herein, given the existence at all times of a statute prohibiting assignment of veterans' benefits, a long history of rejecting tuition arrangements such as that employed by [the plaintiff] and, notwithstanding a sudden change in position of a particular administrator in 1972, an implementing circular carefully limiting conditions of such tuition arrangements.

The court declines to follow the analysis and resultant finding of estoppel in *Los Angeles Community College District v. Roudebush*, No. 77–0097–LEW (C.D.Cal., Feb. 15, 1977), slip op. at 13.[37]

35. That estoppel may be even less available against the government in its sovereign functions than in other types of government actions after *Hibi, supra,* is suggested in *Santiago v. Immigration & Naturalization Service,* 526 F.2d 488, 491 (9th Cir. 1975). That opinion suggests that affirmative misconduct will be a necessary element for estoppel whenever the government acts in its "sovereign role" (as distinguished from its proprietary role) for the purpose of "carrying out its unique governmental functions for the benefit of the whole public," *id.* at 491 n. 6, recognizing that regulation of immigration is a sovereign function.

Accordingly, the Ninth Circuit distinguished the estoppel standards it had employed in *Georgia-Pacific,* note 34 *supra,* wherein the government had sought specific performance of a contract to convey land. In acting as a private party would, as distinguished from the sovereign, the government may be subject to equitable estoppel by the same standards applicable to private actions, *i. e.,* with no additional "affirmative misconduct" requirement, *Santiago, supra,* 526 F.2d at 491 nn. 5 & 6. Compare with *United States v. Wharton,* 514 F.2d 406, 410–412 (9th Cir. 1975), wherein "affirmative misconduct" was held to estop the government from ejecting family who had been wrongfully misadvised regarding right to file land entry claim.

36. *See, e. g., De Rodulfa v. United States,* 149 U.S.App.D.C. 154, 461 F.2d 1240, 1256–1258,

*cert. denied,* 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972), and cases cited therein. The *De Rodulfa* court traces the well-established line of cases sanctioning the special power of the sovereign to administer the veterans benefits programs with almost unbridled discretion, because "veterans' benefits are gratuities and establish no vested rights in the recipients so that they may be withdrawn by Congress at any time and under such conditions as Congress may impose." *Id.* at 1257, quoting *Milliken v. Gleason,* 332 F.2d 122, 123 (1st Cir. 1964), *cert. denied,* 379 U.S. 1002, 85 S.Ct. 723, 13 L.Ed.2d 703 (1965).

37. The district court in *Los Angeles Community College, supra,* had found that 38 U.S.C. § 3101(a) prior to amendment did not prohibit the power of attorney tuition arrangement, which the court found to be a vested security interest. *Contra,* part III.C, *supra.* Thus, the VA was held to be estopped from repudiating the terms of an explicit contract with the college,to pay direct benefits, because the VA was found to have induced the college to establish a special international program for veterans stationed in various locations worldwide. Additionally, we differ in the applicability of the *Georgia Pacific* estoppel standards, *supra* notes 34–35 and accompanying text, and similar cases relied on by the *Los Angeles Community College* court, slip op. at 13.

In conclusion, the VA is not equitably estopped from arguing that the tuition arrangement was prohibited by Section 3101(a) prior to amendment, nor is it estopped from modifying its prior policy to conform to the statute.

## V. CONCLUSION

As modified by the foregoing opinion, the order of the bankruptcy court will be affirmed and the appeal will be dismissed. The accompanying order will be entered.