In re IDAK CORPORATION, et al., Debtors.

IDAK CORPORATION, et al., Plaintiffs,

v.

Peter HIAM, Shelby Mudarri and Martin Atkins, as they are members of the Massachusetts Rate Setting Commission, and William Hogan, as he is Commissioner of the Department of Public Welfare, Defendants.

Nos. 79–1256–L, et al.

United States Bankruptcy Court, D. Massachusetts.

April 6, 1982.

Barry M. Portnoy, Paul L. Criswell, Sullivan & Worcester, Boston, Mass., for plaintiffs.

Leah S. Crothers, Ellen L. Janos, Asst. Attys. Gen., Government Bureau, Dept. of the Atty. Gen., Boston, Mass., for defendants.

Alan L. Lefkowitz, Victor J. Paci, Gaston, Snow & Ely Bartlett, Boston, Mass., for receivers of Idak Corp., et al.

## MEMORANDUM RE OBJECTIONS TO PROOFS OF CLAIM

THOMAS W. LAWLESS, Chief Judge.

On July 5, 1979, the Debtors, Idak Corporation *et al.* filed petitions seeking arrangements with their creditors under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 *et seq.* The Debtors own and operate twen-

ty-seven nursing homes located throughout Massachusetts.[1] Those facilities are the subject of these jointly administered arrangement proceedings. On March 12, 1981, the Massachusetts Department of Public Welfare ("Commonwealth") filed proofs of claim amounting in the aggregate to $5,107,589.66 in twenty-six of these proceedings. The Commonwealth contends that these proofs of claim represent overpayments made to the Debtors under the state Medicaid program.

The Debtors entered into a series of contracts with the Commonwealth which govern their participation in the Medicaid program. Under the program, the Commonwealth pays the Debtors for services provided to citizens of the Commonwealth who are eligible for public assistance. The Commonwealth pays for the services by the Debtors in accordance with rates established by the Massachusetts Rate Setting Commission ("Commission"). The Commission, pursuant to M.G.L. c. 6A § 31 *et seq.*, is empowered to set rates to be paid by the Commonwealth to nursing homes in Massachusetts. The rate setting system is set forth in M.G.L. c. 6A § 32 and 114.2 CMR 2.00. Under this system, the amount of current payments received by the Debtors from the Commonwealth depends upon the "interim rates" set by the Commission. Each of the Debtor nursing homes receives a monthly payment based upon its interim rate. These rates are set annually by the Commission and are retrospective in appli-

cation. The rate is an estimate based upon the adjusted costs of the preceding calendar year, updated to consider inflation. A few years after the interim rates have been paid, a "final rate" for the year in question is calculated for the provider. This rate is computed from the actual costs incurred by the provider during that year based upon cost reports submitted by the provider and audits performed by the Commission. Those reported costs which are not considered allowable under the regulations promulgated by the Commission are not included in the provider's final rate. If the final rate exceeds the interim rate previously paid, the Commonwealth must pay the difference to the provider. If the final rate is less than the interim rate, the nursing home owes the difference to the Commonwealth. 114.2 CMR 2.01(3).

The Commonwealth alleges that the Debtors' final rates for the years 1976–1979 up to the date of filing the Chapter XI proceedings are lower than their interim rates for those years and that the difference of approximately five million dollars is due to the Commonwealth. In addition, the Commonwealth asserts that it is entitled to a priority status for one-half of its claims because this amount was paid by the United States to the Commonwealth as federal participation and may be due back to the United States under law governing the relationship of the Commonwealth and the United States in the Medicaid program.[2]

1. The Debtors are twenty-eight affiliated corporations which are engaged in the business of operating nursing and convalescent homes. The Debtor IDAK corporation owned and controlled directly or indirectly, Edgewood Convalescent Home, Inc., Blue Hills Convalescent Home, Inc., Robbin House Convalescent Home, Inc., Idak Convalescent Center of East Bridgewater, Inc. (successor to Hallmark Nursing Home of East Bridgewater, Inc.), Idak Convalescent Home of New Bedford, Inc. (successor to Hallmark Nursing Home of New Bedford, Inc.), Brigham Manor Convalescent Home, Inc., Country Manor Convalescent Center, Inc., Broadway Convalescent Center, Inc., Star of David Convalescent Home, Inc., Idak Convalescent Center of North Reading, Inc., Idak Convalescent Center of Lawrence, Inc., Idak Convalescent Center of Webster, Inc., Idak Convales-

cent Center of Fall River, Inc., Idak-Grove Convalescent Center, Inc., Talbot Nursing Home, Inc. (successor to Idak Convalescent Center of Dorchester, Inc.), Idak-Highland Convalescent Center, Inc., Idak Resident Care Center of Fitchburg, Inc. (successor to Idak Convalescent Center of Fitchburg, Inc.), Idak Convalescent Center of Lowell, Inc., Idak Convalescent Center of Oxford, Inc., Idak Convalescent Center of Worcester, Inc., Idak Convalescent Center of Needham, Inc., Brittany Towers Nursing Home, Inc., Linden House Nursing Home, Inc., Spring House Nursing Home, Inc., Pines House Nursing Home, Inc., Idak Convalescent Center of Saugus, Inc. (successor to North Shore Convalescent Home, Inc.,), and Idak Convalescent Center of Brighton, Inc.

2. It should be noted that the issue involved was originally presented in this Court. Finding that

On April 1, 1981, the Debtors filed objections to the Commonwealth's proofs of claim together with counterclaims for over a million dollars. The Debtors challenge the calculation of their final rates by the Commission for the years in question. They essentially argue that: (1) the Commission, in determining their final rates for the year 1976, contravened its own regulations by disallowing certain amounts which have been or will be paid for real estate taxes; (2) in calculating the Debtors' final rates for the years 1976, 1977, 1978 and the first half of 1979, the Commission applied 114.2 CMR 2.09(1), the "negative equity" provision, in its computations and the resulting reduction in the Debtors' final rates imposed a penalty upon the Debtors within the meaning of § 57(j) of the Bankruptcy Act, 11 U.S.C. § 93(j); and (3) the Commission reduced the Debtors' final rates by an amount representing imputed interest on certain real estate owned by the Debtors and on certain accounts receivable and this reduction also constitutes a penalty under § 57(j) of the Bankruptcy Act. The Debtors argue that their final rates, when properly calculated, exceed their interim rates for the years in question and that the Commonwealth owes the Debtors $873,181.00. Accordingly, the Debtors have counterclaimed for this amount. This counterclaim relates only to the twenty-six facilities against which the Commonwealth has filed proofs of claim. The Debtors further allege that the Commonwealth refrained from filing a proof of claim against IDAK Convalescent Home of Needham, Inc., d/b/a Briarwood Convalescent and Retirement Home ("Briarwood") because even after the rates for that home were improperly calculated by the Commission, the final rate was $12,800.00 greater than the interim rate. The Commonwealth contends that it has already reduced its proofs of claim to take account of this $12,800.00 excess. The Debtors argue that a proper calculation of the final rate for the Briarwood facility establishes a debt owing to Briarwood in the amount of $243,453.00. The Debtors also counterclaim for this amount. The Debtors' combined counterclaims against the Commonwealth, therefore, total $1,116,644.00. Finally, the Debtors argue that, even if the Commonwealth had a valid claim against the Debtors, the Commonwealth would not be entitled to a priority status as to that claim, since the Commonwealth is not an agent of the United States under the Medicaid program.

On April 15, 1981, the Commonwealth filed a motion to dismiss the Debtors' counterclaims stating as reasons therefore; (1) the bankruptcy court lacks jurisdiction over the matters raised by the counterclaims because these matters are committed to the sole jurisdiction of state regulatory agencies; (2) the counterclaims are barred by the doctrine of sovereign immunity; (3) as to the first counterclaim, the Debtors have failed to exhaust the administrative remedies available to them; and (4) the first counterclaim is barred by the doctrine of res judicata.

The Debtors, the Receivers and the Commonwealth submitted memoranda of law on the issues raised in the Commonwealth's proofs of claim, the Debtors' objections thereto and the Debtors' counterclaims. Hearings were held on May 12, May 26, and July 15 of 1981 during which evidence was presented and testimony transcribed. (hereinafter referred to in chronological order as transcripts 1, 2 and 3). The parties filed with the court a stipulation of facts which, among other things, establishes the dollar impact of the disputed calculations on the Commonwealth's proofs of claim.

■ At the outset, the Commonwealth contends that the arguments set forth in its motion to dismiss the Debtors' counterclaims apply with equal force to preclude a determination of the validity of its proofs of claim. Specifically, the Commonwealth suggests that any application of federal law to determine the validity of its claims must,

I lacked jurisdiction, I transferred the case to the United States District Court, where it is now pending.

of necessity, involve a "redetermination" of the Debtors' rates. The Commonwealth maintains that such a redetermination would constitute an unlawful interference with functions that have been committed to the expertise of a state regulatory agency. The Commonwealth relies in part upon *Palmer v. Massachusetts*, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939), where the Supreme Court held that a district court presiding over a railroad reorganization proceeding was without power to order the discontinuance of railroad service when an application to discontinue the same service was pending before the state's Department of Public Utilities.[3] In the instant proceedings, however, the Commonwealth stands in a different posture than the state agencies in *Palmer* and the other cases cited by the Commonwealth. The Commonwealth has voluntarily filed proofs of claim against the Debtors' estates and has thereby acknowledged the jurisdiction of the bankruptcy court. *Barringer v. Lilley*, 96 F.2d 607 (9th Cir. 1938). The acceptance of the Commonwealth's argument would render this court powerless to consider the disputed claims. Such a result would clearly be contrary to the policy of the Bankruptcy Act. Bankruptcy courts are empowered to "allow", "disallow" and "reconsider" claims pursuant to § 2(a)(2) of the Bankruptcy Act, 11 U.S.C. § 11(a)(2).[4] "[A] bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence." *Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). Although issues have arisen which involve conflicts between state and federal interests, this court, in the context of these bankruptcy proceedings, has the authority to examine the Commonwealth's claims to ensure that they are allowable under federal bankruptcy law. *See In re Abramson*, 210 F. 878 (2nd Cir. 1914); *In re Credle*, 3 C.B.C. 498 (Bkrtcy.E.D.N.Y.1975).

In addition, the Debtors are not required to exhaust their administrative or state law remedies before challenging the Commonwealth's claims when their challenge is based upon grounds that are available only in bankruptcy proceedings.

The Debtors could not have raised the penalty issue before the Commission when the Commission was required, under its own regulations, to impose that penalty.

## PRIORITY STATUS

The Commonwealth claims priority status for one-half of its claims as debts owed to the United States Government (Section 64(a)(5) of the Bankruptcy Act, 11 U.S.C. § 104(a)(5) provides in part: "The debts to have priority . . . shall be . . . debts other than for taxes owing to any person, including the United States, who by the laws of the United States is entitled to priority . . . ."). The Commonwealth purports to be an agent of the Federal Government. The Commonwealth maintains that by virtue of its involvement in the federal Medicaid program it is authorized to make its proofs of claim on behalf of the United States Government. This argument is without merit. No agency exists. Debtor has no direct relationship with the Federal Government.

The United States makes grants to the state amounting to about one-half the states payments to the debtor under the state Medicaid program.[5]

Whether an agency exists is a question of fact which may be established either by direct or by circumstantial evidence. 3 Am.Jur.2d *Agency* § 21 (1964). The Commonwealth's participation in the federal Medicaid program is, by itself, insufficient to establish an agency relationship. An agency is generally created by an

---

**3.** Other decisions cited by the Commonwealth in support of this argument are *Commonwealth v. Sisk*, No. 79-854-N (D.Mass. Oct. 25, 1979); *Matter of Canarico Quarries, Inc.*, 466 F.Supp. 1333 (D.P.R.1979); and *Colonial Tavern, Inc. v. Byrne*, 420 F.Supp. 44 (D.Mass.1976).

**4.** § 11(a)(2) provides that a bankruptcy court may "[a]llow claims, disallow claims, reconsider allowed or disallowed claims, and allow or disallow them against bankrupt estates."

**5.** See 42 U.S.C. § 1396 et seq.

agreement of the parties. The consent of the principal is necessary to establish the relationship. *West Virginia Railway Co. v. Jewitt Bigelow & Brook Coal Co.*, 26 F.2d 503 (D.Ky.1938). The federal Medicaid statute, 42 U.S.C. § 1396 *et seq.*, does not provide for consent by the United States and the evidence does not indicate that the United States either expressly or impliedly gave such consent. Indeed, the United States has expressly denied that an agency relationship exists.[6] Although a claim for the federal share of funds disbursed to the Debtors may be entitled to a priority status, the Commonwealth is not entitled to claim that status.

Although the Commonwealth, at all times, has the ultimate burden of persuasion in sustaining its claims, the verified proofs of claim are prima facie evidence of the claims' validity which require the Debtors to produce enough evidence to overcome the Commonwealth's prima facie case. *Matter of Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977); *Matter of Colorado Corp.*, 531 F.2d 463 (10th Cir. 1976); *Watson v. Thompson*, 456 F.Supp. 432 (S.D.Ga.1978).

## REAL ESTATE TAXES

■ The Commission, in calculating the Debtors' final rates for the year 1976, disallowed certain amounts representing local real estate taxes owed by the Debtors to various municipalities. The Commission determined that the Debtors had not paid the taxes and, therefore, those costs were not included in the Debtors' final rates. The exclusion of those costs increased the Commonwealth's claims against the Debtors by $728,604.00. The Debtors argue that unpaid taxes are legitimate, allowable and reimbursable costs according to the Commission's own regulations. The Debtors further contend that they have previously paid the bulk of these taxes and the remaining unpaid taxes will be paid upon confirmation of the plan of arrangement. Finally, the Debtors argue that equitable considerations warrant the reduction of the Commonwealth's claims by the amount of the taxes.[7]

The Debtors rely upon M.G.L. c. 6A § 32 which provides in part:

> In determining rates to be paid by governmental units to providers of services, the commission shall ... establish by regulation those expenses treated as business deductions under the Internal Revenue Code which shall be included as allowable operating expenses in determining rates of reimbursement.... The commission shall promulgate rules and regulations for the administration of its duties and the determination of rates as are herein required.

They point out that pursuant to the above statute, the Commission promulgated Rates of Payment to Long Term Care Facilities, 114.2 which defined "Fixed costs" in 114.2 CMR § 2.02(8) to include "real estate taxes." The Debtors contend that, since the applicable statutes and regulations require reimbursement of actual costs, the real estate taxes should be factored into their final rates. The evidence, however, does not indicate that the Debtors have actually paid any of these taxes. Nevertheless, the Debtors argue that unpaid, accrued taxes are an actual cost for which they are entitled to be reimbursed. They maintain that the Commission has contravened its own

---

**6.** Letter to me of March 24, 1981 from Assistant Attorney General Zinora Mitchell.

**7.** The Commonwealth argues that, at a hearing on May 26, 1981, Debtors' counsel waived these objections to the Commonwealth's claims which are based upon disallowed real estate taxes (transcript 2 at 41). The evidence does not support this argument. Waiver is the intentional relinquishment of a known right. A party must intend to relinquish a right in order for a waiver of that right to occur. *In re Wil-Low Cafeterias*, 95 F.2d 306 (2nd Cir. 1938). Debtors' counsel conditioned any waiver upon a determination by this court that the Debtors had not raised certain arguments relating to the validity of the Commonwealth's claims for disallowed taxes. This court has determined that the Debtors did, in fact, raise such arguments. Furthermore, the statement by Debtors' counsel did not clearly identify what rights the Debtors intended to waive. In any event, the Debtors did not intend an unconditional waiver of their objections to the claims for disallowed real estate taxes.

regulations by excluding this cost from their final rates.

The Commonwealth notes another regulation, 114.2 CMR 2.06(5)(1) which gives the Commission discretion to exclude from reasonable operating costs accrued expenses that have remained unpaid one year after the close of the cost reporting year. This regulation also provides that such expenses shall be included in the rate for the year in which they are actually paid. The Commission generally excludes unpaid expenses from its rate calculations when the underlying debts have remained unpaid for a great length of time. Such costs are excluded because of the possibility that the provider will never pay the debt or the debt will be forgiven or, in the case of real estate taxes, an abatement will occur (transcript 3 at 160).

■■ The Debtors appealed to the Division of Hearing Officers from the final rates set by the Commission for the calendar year 1976 (stipulation at 31). However, the Debtors failed to prosecute these appeals and on February 3, 1981, the Division of Hearing Officers dismissed the appeals with prejudice by an Order of Dismissal of Inactive Appeal (stipulation at 31). This dismissal amounted to a final determination of the Debtors' rates under state law and is as conclusive as though it had been rendered by a court of general jurisdiction. *Tidewater Oil Company v. Jackson*, 320 F.2d 157 (10th Cir. 1963), *cert. denied*, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963). As a general rule, in determining whether claims of creditors are allowable, bankruptcy courts are required to give res judicata effect to prior judgments of non-bankruptcy courts. *Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946); *Kapp v. Naturelle, Inc.*, 611 F.2d 703, 708 (10th Cir. 1979). The portion of the Debtors' argument that challenges the accounting principles used by the Commission is based solely upon issues of state law that could have been raised in the prior administrative proceedings or in state court. "Res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Brown v. Felson*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979) citing *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 378, 60 S.Ct. 317, 320, 84 L.Ed. 329 (1940).

■ In the instant case, however, the Debtors also raise equitable grounds for disallowance that are based upon federal bankruptcy law and which were not available in the prior proceedings. Assuming that the Commonwealth's claim for real estate taxes is valid under the law of Massachusetts, this Court must still decide whether allowance of that claim would be compatible with the policy of the Bankruptcy Act. *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162, 67 S.Ct. 237, 239–240, 91 L.Ed. 162 (1946).

■ It is the Debtor's position that the claims for unpaid real estate taxes should be disallowed in order to ensure an equitable distribution of the assets of the estate. A bankruptcy court, as a court of equity, has broad powers to determine what claims are allowable and how a debtor's assets shall be distributed. *Id*, 329 U.S. at 162–63, 67 S.Ct. at 240; *Heiser v. Woodruff, supra*, 327 U.S. at 732–33, 66 S.Ct. at 856. The Debtors rely upon *Vanston, supra*, where the Supreme Court disallowed bondholders' claims for the payment of interest on interest on the grounds that the exaction of such interest was in the nature of a penalty and because it would be inequitable to enrich the bondholders at the expense of subordinate creditors.

■ The Court finds no basis for disallowance. The Commonwealth advanced funds to the Debtors to be used in satisfaction of indebtedness of the Debtors and the funds were not so used by the Debtors. The equities that warranted disallowance in *Vanston* are not apparent in the case at hand. This is a classic type of claim in bankruptcy. It is not attended by colors of penalty. The likelihood that the underlying debt for real estate taxes will be extin-

guished in the future by payment, pursuant to a plan of reorganization or otherwise,[8] does not justify the present disallowance of a valid existing claim.[9] The Commonwealth has met its burden of persuasion in sustaining that portion of its proofs of claim that relate to real estate taxes. Accordingly, those claims are allowed.

### NEGATIVE EQUITY

The Debtors present a more substantial argument concerning that portion of the Commonwealth's claims that result from the application of the so called "negative equity" provision, 114.2 CMR § 2.09(1). The Commonwealth, pursuant to this provision, decreased the Debtors' final rates for the years 1976 through the first half of 1979 by a total of $4,175,231.00. The Commonwealth included this amount in its proofs of claim. The Debtors contend that the negative equity provision is a penalty under the Bankruptcy Act.

Section 57(j) of the Bankruptcy Act of 1898, as amended, 11 U.S.C. § 93(j) provides:

Debts owing to the United States or to any State or any subdivision thereof as a penalty or forfeiture shall not be allowed, except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose, with reasonable and actual costs occasioned thereby and such interest as may have accrued on the amount of such loss according to law.

This provision protects a debtor's estate from penalties imposed by a governmental entity when those penalties are not related to pecuniary loss sustained by that entity. The Supreme Court, in *Simonson v. Granquist*, 369 U.S. 38, 82 S.Ct. 537, 7 L.Ed.2d 557 (1962), explained the policy behind § 57(j);

[I]t plainly manifests a congressional purpose to bar all claims of any kind against a bankrupt except those based on a 'pecuniary' loss. So understood, this section, which has been a part of the Bankruptcy Act since its enactment in 1898, is in keeping with the broad aim of the Act to provide for the conservation of the estates of insolvents to the end that there may be as equitable a distribution of assets as is consistent with the type of claim involved. Moreover, the prohibition of all tax penalties in bankruptcy is wholly consistent with the policy of the penalty provisions themselves. Tax penalties are imposed at least in part as punitive measures against persons who have been guilty of some default or wrong. Enforcement of penalties against the estates of bankrupts, however, would serve not to punish the delinquent taxpayers, but rather their entirely innocent creditors.

*Id.*, 369 U.S. at 40–41, 82 S.Ct. at 538–39.

Since the regulations do not characterize the negative equity provision as a penalty, this court must look to the nature of and purposes behind the provision. An appropriate test to determine whether or not an obligation is a penalty was enunciated by Judge Learned Hand in *In re Caponigri*, 193 F. 291 (S.D.N.Y.1912). Judge Hand stated: "In substance, an obligation is penal when its amount is measured neither by the obligee's loss nor by the valuation placed by him upon what he has given in exchange." *Id.*, at 193 F. 292.

Rate Setting Commission regulation 114.2 CMR § 2.09(1) provides in part:

The per diem rate of a proprietary provider which has a positive equity position shall be increased by an annually determined percentage of the average equity capital divided by the larger of the provider's actual patient day census for the calendar year of ninety-five percent of the provider's total bed capacity for the calendar year. The per diem rate of a proprietary provider which has a negative

---

8. *See U.S. v. Rahar's Inn, Inc.*, 243 F.Supp. 459 (D.Mass.1965); *Wiggin v. Lowell Five Cent Savings Bank*, 299 Mass. 518, 13 N.E.2d 433 (1938).

9. To the extent that the real estate taxes are satisfied pursuant to confirmation, the Court will consider the equities of any payment to the Commonwealth under this unsecured claim.

equity position shall be decreased by said annually determined percentage of the average equity capital divided by the larger of the provider's actual patient day census for the calendar year or ninety-five percent of the provider's total bed capacity for the year.

Average equity capital essentially is a facility's average net worth calculated according to the rules set forth in § 2.09(2)–(6). It is defined in § 2.02(4) as "[t]he average of the difference between a provider's assets and liabilities at the beginning of the year and at the end of the year in accordance with section 2.09." Under § 2.09(2), the Commission examines the books and records of a facility and its related parties and determines both the amount of the facility's average equity capital and whether that amount is positive or negative. Section 2.09(6)(a)–(r) provides for the exclusion of certain items from a provider's equity capital. These items include the face value of notes and loans receivable owed to the facility by affiliates or related parties (transcript 3 at 50, 97, 123) as well as any excess in the cost of assets or land over the basis of those assets or land as established by the Commission under § 2.12. These exclusions are partially offset by an addition to equity capital under § 2.09(4). This addition, however, only includes the face value of mortgages that were necessary for the original construction of the facility and does not include mortgages on the property that were obtained after the facility was built (transcript 3 at 38–42, 53). The exclusion of items from a provider's equity capital results in a negative impact upon the provider's equity position.

After the Commission has completed its calculations under § 2.09(2)–(6), it applies an interest factor to the amount of average equity capital it has computed. This interest factor or "annually determined percentage" is defined under § 2.09(1)(b) to equal "one and one-half times the average of the monthly rates of interest on special issues of public debt issued to the Federal Hospital Insurance Trust Fund" (stipulation at attachment D, transcript 3 at 58). If a facility has a negative net worth or negative equity position, then its final rate of reimbursement is decreased by the percentage of its average capital computed under § 2.09(1). If the facility has a positive equity position, then its final rate is increased by this percentage of its average equity capital.

In order to understand the impact of § 2.09(1) on the Debtors' final rates, several other sections of the regulations must also be examined. Section 2.04(1) indicates that the final rate of payment represents the sum of the elements set forth in §§ 2.06–2.11, each computed for the calendar year on a per diem basis. Sections 2.06, 2.07, 2.08, 2.10 and 2.11 set out, respectively, the methods for calculating reasonable operating costs, an administration and policy planning allowance, nursing costs, interest expense and depreciation. The reimbursable amounts of these items are computed for each nursing home in accordance with the regulations set forth in their respective sections. Section 2.09 provides for an additional rate adjustment based upon the provider's equity position, be it positive or negative. Section 2.10, which governs reimbursement for interest expense provides in pertinent part: "Interest expense . . . shall be included in the rate in the following cases: (a) Short-term borrowings to finance necessary and proper current working capital needs; and (b) Long-term debt, supported by a fixed asset and subject to the limitations set forth in Section 2.12." Under § 2.10(4), when a facility loans funds to an owner, officer or related party, the Commission imputes interest on those loans and reduces the facility's interest expense by that amount.

Section 2.12 is a key provision which limits the basis of a facility's assets for the purposes of computing interest expense under § 2.10 and equity capital under § 2.09. Pursuant to § 2.12, the Commission used a standard of "reasonableness" to calculate the allowable basis for a provider's newly constructed nursing homes. The Commission determined what was reasonable by calculating the average building costs for

all new facilities constructed in Massachusetts during the year in question (transcript 1 at 82, transcript 3 at 43–44). When a provider purchased already existing facilities, a similar test of reasonableness based upon a schedule of cost per bed was applied to determine allowable basis (transcript 3 at 78). When a facility's long term debt exceeded its allowable basis, any costs which arose from the excess long term debt were deemed unnecessary by the Commission. Consequently, the Debtors were not reimbursed for interest expense that arose from that portion of their long term debt which exceeded their facilities' allowable basis. In addition, the Commission subtracted the amount of this excess long term debt from the Debtors' equity positions. The Commission also subtracted the face amount of notes and loans receivable to related parties from the Debtors equity positions. Although there are other additions and deductions to the Debtors' average equity capital under § 2.09, none are as substantial as the deductions representing notes and loans receivable and the excess cost of assets.[10] These deductions enlarged the Debtors' negative equity positions and thereby increased the amount by which their rates were reduced under § 2.09(1).

The operation of these regulations is best explained by way of example. Assuming that a provider constructed a facility for ten million dollars and obtained mortgages on that property totalling fifteen million dollars but the Commission determined that the allowable basis for the facility, under § 2.12, was only eight million dollars, then the provider would only be reimbursed for the interest expense arising from eight million dollars. Under § 2.10, the interest expense on the additional seven million dollars of long term debt would not be allowed (transcript 1 at 49–51, transcript 3 at 118–20). In addition, under § 2.09(6), the seven million dollar excess cost of assets would be excluded from the provider's equity capital. Two million dollars, the difference between

the allowable basis and the actual construction cost, would be added back to equity pursuant to § 2.09(4). The net result would be a five million dollar negative impact on the provider's equity position. If the same provider had also loaned four million dollars to an affiliate or related party, then, under § 2.10(4), the provider's reimbursable interest expense would be reduced by an amount of interest imputed on that loan. In addition, if the provider listed that loan receivable as an asset on its books, then under § 2.09(6), the face value of the loan would be subtracted from the provider's equity capital, resulting in an additional four million dollar negative impact on its equity position. If the Commission ultimately determined that the provider had a negative equity position, the provider's final rate would be reduced by a percentage of its average equity capital pursuant to § 2.09(1) (transcript 3 at 118–22, 149).

The Commonwealth takes the position that the negative equity provision was developed to compensate for overcharges made elsewhere in the rate setting process and, as such, the provision is similar to a liquidated damages clause. The Commonwealth maintains that when a provider is undercapitalized, it must pay a higher interest rate for working capital loans. However, this excessive interest expense would also be disallowed under § 2.10 (transcript 3 at 153). The evidence indicates that providers with negative equity positions file petitions for administrative rate relief. However, providers with positive equity positions file these petitions as well (transcript 3 at 153). No evidence was presented that would establish a relationship between negative equity and the filing of petitions for rate relief. The Commonwealth asserts that the negative equity calculations were developed to insure precise reimbursement for Medicaid patient expenses. Yet, the annually determined percentage that was applied to calculate the amount by which

---

10. The schedule used to compute the final rate for the Star of David Convalescent Home reveals deductions from average equity capital totalling approximately $1,100,000.00. Of this amount, approximately $1,000,000.00 represents deductions for loans receivable and excess cost of assets.

the Debtors' rates were reduced was equal to one and one-half times the average of the monthly rates of interest on issues of public debt issued to a trust fund. The Commonwealth has failed to explain the significance of this formula which appears to be totally unrelated to Medicaid patient expenses. Although the Commonwealth has made general allegations of overcharges by the Debtors, it has not identified a specific source of revenue loss that resulted from the Debtors' negative equity positions. A mere assertion that a debt represents liquidated damages will not prevent a bankruptcy court from determining that the debt is a penalty under § 57j. *See United States v. Moore*, 366 F.2d 243 (5th Cir. 1966).

 In 1979, the Massachusetts Legislature prohibited the Commission from using the negative equity provision in its Medicaid rate calculations. Mass.Acts 1979, c. 567. This provision states in part, "that the Commission shall not cause a decrease in a rate or add a penalty to a rate because such home has an equity position which is less than zero." In 1977, during an administrative hearing covering negative equity, Rate Setting Commissioner Shelby Mudarri commented on the policy objectives of the commission. He stated: "What we are trying to do is discourage negative equity." Transcript of Public Hearing before the Rate Setting Commission of Massachusetts, September 7, 1977 re 14 C H S R 2.02, pg. 108. The primary purpose of a penalty is to regulate conduct rather than produce revenue. *In re Standard Composition Co.*, 23 F.Supp. 391, 394 (E.D.Mich.1938). There can be little doubt that the primary purpose of the negative equity provision was to regulate the financial structure of the Debtors' facilities (transcript 3 at 86). It is evident that the negative equity provision served a regulatory purpose and did not compensate the Commonwealth for revenue loss. The provision, therefore, is a penalty and that portion of the Commonwealth's claims which arise from its application must be disallowed.

## IMPUTED INTEREST

 In calculating the Debtor's final rates for the year 1977 through 1979, the Commission imputed interest on the Debtors' loans receivable from owners, officers and related parties. In addition, the Commission imputed interest on the value of certain parcels of land that had been purchased by the Debtors from related parties on the theory that those purchasers were the economic equivalent of loans to the related parties (transcript 3 at 98). Pursuant to § 2.10(4), *supra*, the Commission deducted this imputed interest from the Debtors' reimbursable interest expense. This deduction reduced the Debtors' final rates and increased the Commonwealth's proofs of claim by $833,610.00.

The Debtors contend that the "imputed interest" provision, like the negative equity provision, is a penalty and that any portion of the Commonwealth's claim arising from its application should be disallowed. It is the Debtors' position that the rate reductions for imputed interest did not compensate the Commonwealth for pecuniary loss but simply duplicated rate reductions that occurred under other sections of the regulations. The issues once again, are whether the Commonwealth's claims relating to the imputed interest provision are an effort to recover a loss sustained by the Commonwealth, and whether the claims are such that they should be considered as a matter of equity.

The Commonwealth contends that the purpose of the imputed interest provision is to reduce rates by interest expense arising from unnecessary working capital loans and to prevent the Medicaid program from indirectly paying the interest expense associated with the private investments of providers.

At first glance, regulations to accomplish these ends appear related to rate setting objectives. But in applications considered with other regulations, they lose this appearance. When a provider lends money to a related party and has to borrow additional monies for working capital, the Commission views the new working capital needs unnec-

essary. (transcript 3 at 109–10, 151). Under § 2.10(1)(a), reimbursement is only allowable for necessary working capital loans. And so no interest on the "unnecessary" working capital loans is included in rate calculations. And so the Commission imputes interest on the loans receivable from related parties and reduces the providers interest expense allowable in rate calculations (transcript 3 at 102, 103).

This second rate reduction in my judgment colors the picture as to the motivation of the Commonwealth and requires scrutiny as to the equitable basis of the claim. As I understand the rate regulations in operation, if a provider borrows money and loans it to its owner principal, the interest item is disallowed as "unnecessary" and other interest generally allowable is reduced by imputed interest on the loan to the owner.

Under these circumstances the only motivation discernible to me is the control of provider conduct.

Wherewith the double impact may not be open to challenge outside of bankruptcy, I believe that the claim resting on imputed interest calculations is a penalty.

So much of the Commonwealth's claim as rests on imputed interest calculations is disallowed.

### BRIARWOOD FACILITY

The Commonwealth's claims which represent reductions in the final rates of the Briarwood facility are disallowed to the extent that they result from the application of the negative equity and imputed interest provisions.

The Commonwealth's claims which represent reductions in the final rates of the Briarwood facility are allowed to the extent that those claims result from unpaid 1976 real estate taxes.

### DEBTORS' CLAIM FOR AFFIRMATIVE RELIEF

The parties have stipulated that if the Commonwealth's claims are disallowed, there will result a balance due from the Commonwealth to the Debtor. The Debt-

ors' counterclaims seek affirmative relief. The Commonwealth asserts that affirmative relief is not to be allowed because of the application of the Eleventh Amendment to the United States Constitution.

I believe it unnecessary to reach the constitutional question.

No suggestion is made that the Commonwealth's regulations are unlawful or improperly applied. No support is given the claim for affirmative relief. This court has considered the problems posed only in the context of bankruptcy proceedings relating to allowance and disallowance of claims.