In re ERLIN MANOR NURSING HOME, INC. d/b/a Casa Grande Long Term Care Facility, Casa Grande, et al., Debtors.

ERLIN MANOR NURSING HOME, INC., et al., Plaintiffs,

v.

The RATE SETTING COMMISSION OF the COMMONWEALTH OF MASSACHUSETTS, et al., Defendants.

In re FIRST IPSWICH COMPANY, INC., et al., Debtors.

WEST SIDE CORPORATION, et al., Plaintiffs,

v.

Peter HIAM, et al., Defendants.

Bankruptcy Nos. 81–02344–JG to 81–02346–JG, 79–01664–JG to 79–01667–JG.

Adv. No. 83–0711.

United States Bankruptcy Court, D. Massachusetts.

Jan. 18, 1984.

Timothy H. Gailey, Hale & Dorr, Boston, Mass., for plaintiffs/debtors.

Stephen S. Ostrach, Asst. Atty. Gen., Government Bureau, Boston, Mass., for defendant Com. of Mass.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

### STATEMENT OF FACTS:

In these two adversary proceedings, the Chapter XI and Chapter 11 debtor nursing homes ("debtors" or "nursing homes") seek to enjoin the Commonwealth of Massachu- setts Rate Setting Commission ("Commission") from making deductions because of the debtors' "negative equity" for numerous years prior to 1979. After evidentiary hearing on the debtors' Motion for Preliminary Injunction, and based upon the pleadings, agreed facts, and testimony, the Court makes the following findings.

West Side Corporation, Claflin Hill Corporation, Houghton Corporation and First Ipswich Company, Inc. filed Chapter XI Petitions under the former Bankruptcy Act on September 6, 1979. Dartmouth House Nursing Home, Inc., St. John's Nursing Home, Inc., and Erlin Manor Nursing Home, Inc. filed Chapter 11 Petitions under the Bankruptcy Code on December 31, 1981. Each debtor has been retained as debtor-in-possession, and provides long-term health care to patients who qualify for Medicaid, under the Social Security Act, 42 U.S.C. Section 1396 *et seq.* Pursuant to the Medicaid statute, the Massachusetts Department of Public Welfare is required to reimburse participating nursing homes for the costs of health care services to Medicaid patients. Massachusetts, by statute, has established a regulatory scheme for setting the rates of reimbursement, whereby the Rate Setting Commission establishes the binding rate. *See* 114.2 C.M.R. 2.11. An interim rate is set for all facilities for an annual period commencing July 1 of each year. At the end of each calendar year, a provider must submit cost reports to the Commission which is then bound to set the final rate of payment within a reasonable time. Any difference between the final rate and the interim rate is either an obligation of the state or of the home depending on whether the final rate is lower or higher than the interim rate. The final rate is a calculation of reasonable operating costs on a per diem basis based on a number of elements: an administration policy planning allowance, reasonable costs for patient care, and prior to 1979 there was an adjustment for positive or negative equity capital. 114.2 C.M.R. Section 2.06-2-11.

Prior to setting the final rates, the Commission conducts a field or desk audit to

determine a provider's allowable costs. It disallows unreasonable, unnecessary and unsubstantiated costs, plus those exceeding the Commission's limits. In addition, prior to 1979, the Commission calculated into the rate an "equity factor", which is the subject of this dispute. The equity regulation was repealed by the Massachusetts legislature effective as of November 1, 1979. The rate of a provider with a negative equity position was decreased by a determined percentage of the average equity capital divided by the number of patient days. The negative equity assessment was made after the Commission's determination of the provider's allowable expenses for patient care. 114 C.M.R. Section 2.09(1). It was not imposed however, on non-profit homes or on those which had negative equity because their costs exceeded state limits.

The rate of a provider with a positive or zero equity remained unaffected by the equity factor, and its costs would be fully reimbursed. If a provider had a negative equity, however, the final rate would be decreased so that allowable costs would not be fully reimbursed. In these cases the negative equity deduction was computed in accordance with the regulation by first determining each facility's average equity capital. This was essentially a determination of a home's worth, less certain items excluded by the state, such as notes owed by insiders and mortgages incurred after construction. Next, the state applied an interest rate which differed from year to year, and then divided this by patient days to figure the per diem negative equity deduction. The Commission finally subtracted this amount from the debtor's allowable fixed and variable costs in determining the final rates. The effect of the deduction was to deny the provider reimbursement for services already provided.

No final rates had been established for these homes for years 1977, 1978 or 1979 as of the date of the filing. In December, 1981 the Commission set the 1976 rate. In August 1983 the Commission announced proposed final rates for years 1977, 1978, 1979 and 1980. After the filing of these adversary proceedings and after counsel for the Commonwealth had agreed to maintain the status quo, the Commission set the final rates as proposed. The debtors' rates included deductions totalling one-million two hundred eighty-two thousand dollars ($1,282,000) by reason of the negative factor.

THE COMMONWEALTH'S MOTION TO DISMISS:

The Commonwealth moves to dismiss the debtors' complaints in both the Act and Code cases, raising numerous objections to this Court's jurisdiction to enjoin the negative equity assessment.

The Commonwealth contends that the Court lacks jurisdiction over the adversary proceedings in the Code cases because of the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The Commonwealth argues that Northern Pipeline struck down the entire jurisdictional grant of Section 1471 depriving district courts as well as bankruptcy courts of all jurisdiction. Thus, it argues the Emergency Rule adopted in this district is invalid. There is authority in support of the Commonwealth's position. *E.g., In Re Herrero,* 10 B.C.D. 123 (D.Colo. 1983); *In Re Color Craft Press, Ltd.,* 36 B.R. 680, 10 B.C.D. 53 (D.Utah 1983).

The emergency rule has however, been upheld by every court of appeals which has examined it. *See In Re White Motors Corp. v. Citibank,* 704 F.2d 254 (6th Cir.1983); *Matter of Hansen,* 702 F.2d 728 (8th Cir. 1983); *In Re Braniff Airways,* 27 B.R. 231 (D.C.Tex.1983); aff'd, 700 F.2d 214 (5th Cir. 1983); *In Re Coastal Steel Corp.,* 709 F.2d 190 (3d Cir.1983). Moreover, the rule has been held valid in this district by the district court, *In Re WHET, Inc.,* Slip Opinion No. 80–1542–HL–T (D.Mass. May 16, 1983), and by two judges of the bankruptcy court for this district. *In Re Lipman Bros.,* 27 B.R. 529 (Bkrtcy.D.Mass.1983); *In Re Sentinel Energy Control Systems, Inc.,* 27 B.R. 795 (Bkrtcy.D.Mass.1983).

This Court is mindful of the many difficulties created by the emergency rule's re-

sponse to Congress' failure to remedy the Code's jurisdictional defect. I believe it presumptuous, however to depart from the Rule's directive contrary to the decisions of the courts of appeals and contrary to the decisions in this jurisdiction upholding the rule. More importantly, a determination that the rule is invalid would deprive debtors and creditors of any bankruptcy relief, and would create such enormous chaos as to be an abandonment of judicial responsibility. Therefore, I will exercise that jurisdiction granted by the emergency rule.

■ Under the terms of the rule, the Bankruptcy Court may enter a judgment in "non-related" proceedings, which includes matters concerning estate administration, claims against the estate, turnover of estate property, and "similar matters." Emergency Rule, December 24, 1982, sub-section (d)(3)(A). In related proceedings, the Bankruptcy Court is not empowered to enter orders, but must propose orders and findings to the District Court. Related proceedings are "civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or a state court and include claims brought by the estate against parties who have not filed claims against the estate." Emergency Rule, subsection (d)(3)(A). The term "claim" as defined in the Code means "right to payment ... whether reduced to judgment, liquidate, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured or unsecured".

These adversary proceedings are not related proceedings, but rather are matters arising under Title 11. The question presented in these cases is whether the state's reduction of the debtors' rates constitutes a claim for a penalty which should be subordinated or disallowed in the distribution scheme of Chapter 11. Resolution of this issue requires interpretation of Code sections 507, 726 and 1129. This action could not have been brought in a state or district court but can only be resolved in a bankruptcy forum.

The absence of a claim filed by the Commonwealth does not alter this conclusion, because in effect, and directly, the Commonwealth is asserting a right to payment against the debtor's right to reimbursement. Accordingly, these adversary proceedings are subject to judgment by this Court.

■ The Commonwealth moves to dismiss the complaints in the Act cases on the ground the controversy is beyond the summary jurisdiction of the bankruptcy courts under the former Act. The Commonwealth's argument ignores Section 2a(15) of the Act, which empowers bankruptcy courts to "make such orders and enter such judgments in addition to those provided for, as may be necessary for the enforcement of the provisions of the Act". Bankruptcy Act, Section 2a(15), 11 U.S.C., Section 11a.(15) (repealed October 1, 1979). This broad grant of residual equitable jurisdiction includes the power to issue injunctions to protect the assets of the Chapter XI debtor as a means to achieve the ultimate aim of rehabilitation and to prevent interference with the Court's administration of the case. *J. Moore, 1 Collier on Bankruptcy,* Section 2.61, at 324–25 (14th ed. Supp. 1982).

■ The Commonwealth is correct in pointing out that the Act does not confer jurisdiction over all controversies that in some way affect the debtor's estate. *Callaway v. Benton,* 336 U.S. 132, 142, 69 S.Ct. 435, 441, 93 L.Ed. 553 (1949). However, where there exists a controversy over a property interest of the estate, the Court has jurisdiction to enjoin interference with the property interest. There is no doubt that the debtors' right to reimbursement is a property interest of the estate. This Court may enjoin interference with this asset. *See American Training Services, Inc., vs. Veterans Administration,* 434 F.Supp. 988, 992 (D.N.J.1977). There, the district court sustained bankruptcy court jurisdiction over an action by the debtor, a school, seeking an injunction against the Veterans Administration to compel it to pay students benefits directly to the school. *Id.* at 990.

Basing the existence of jurisdiction to enjoin the V.A. on section 2a(15), the Court found that the V.A.'s action impaired a substantial property interest—the estate's entitlement to benefits—to the detriment of creditors, and interfered with the object of reorganization. *Id.* at 992. The Court rejected the assertion that since a V.A. administrative regulation barred the direct payment procedure, that it was without power to adjudicate the dispute. *Id.* at 992. Similarly, in the present case, the state has asserted a right to deduct amounts from debtors' entitlement to reimbursement. This is a controversy over a substantial property interest of the debtors over which this Court has jurisdiction to entertain a request for equitable relief.

The defendant relies on *French and Polyclinic Medical School and Health Center, Inc. v. Associated Hospital Service of New York,* 387 F.Supp. 1359 (S.D.N.Y.1973) in support of its contention that this Court lacks jurisdiction over an action to recover the difference between rates paid and alleged allowable rates. Although that decision did hold such an action a plenary suit, the Court's reasoning was based on 28 U.S.C. Section 1334, which gives district courts bankruptcy jurisdiction, and did not consider Section 2a(15) or any other jurisdictional grant under the Act. *Id.* at 1362.

Third, the Commonwealth moves to dismiss all the complaints in both the Act and Code cases on the ground that the negative equity assessment is purely a state regulatory function of the rate setting system in which the bankruptcy court has no jurisdiction to interfere. The Commonwealth asserts that the Court must defer to the absolute exclusive jurisdiction of the Rate Setting Commission.

■ The Supremacy Clause of the United States Constitution provides that Congress shall establish uniform bankruptcy laws throughout the United States U.S.C.A., Constitution, Article I, Section 8. Where Congress has enacted bankruptcy legislation which conflicts with state law, state law must yield. *Johnson v. First National Bank of Montevideo,* 719 F.2d 270, 273 (8th

Cir.1983). Thus, even though a state regulation may be viable in the state sphere, once it conflicts with bankruptcy law, it loses its validity in the bankruptcy context. *Matter of the Bohack Corp.,* 2 B.C.D. 1740, 1742 (Bankr.E.D.N.Y.1977). *See Perez v. Campbell,* 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971).

■ The issue presented in this case is whether the state's negative equity assessment is incompatible with bankruptcy law because it is in essence a penalty. Whether a claim is a penalty presents a purely bankruptcy question. *In Re Idak Corp.,* 19 B.R. 765, 769, 771 (Bkrtcy.D.Mass.1982). The debtors are not requesting that the Court redetermine the debtors' rates but rather request the Court to examine whether the application of the negative equity factor is in effect a penalty which is contrary to bankruptcy law.

■ The Commonwealth asserts that this Court is prohibited from entertaining the present actions because debtors are seeking a redetermination of their rates, establishment of which is solely within the state's police power. Courts have consistently distinguished governmental actions which attempt to obtain a pecuniary advantage from those which attempt to further the public welfare. *See, e.g., In Re Aegean Fare, Inc.,* 35 B.R. 923 (Bkrtcy.D.Mass. 1983). The former are subject to the Bankruptcy Code's automatic stay provisions and injunctive power. *Missouri v. U.S. Bankruptcy Court for the E.D. of Arkansas (Lindsey),* 647 F.2d 768 (8th Cir. 1981). The latter are exempt from bankruptcy court interference. *Colonial Tavern, Inc. v. Byrne,* 420 F.Supp. 44 (D.Mass.1976).

■ A state's regulatory action in enforcing a monetary assessment against a provider because of alleged financial difficulties is not, in my view, in furtherance of the public health, safety and welfare. Rather, the monetary assessment is an attempt to regulate the financial structure of the debtors. *In Re Idak Corp.,* 19 B.R. 765 (Bkrtcy. D.Mass.1982). Accordingly, adjudication of whether the assessment constitutes a penal-

ty does not interfere with the state's legitimate exercise of its police power.

Next, the Commonwealth contends that the complaints in both cases should be dismissed because the debtors have failed to exhaust required administrative remedies under state law. Any provider aggrieved by a final rate has the right to appeal to the Division of Hearing Officers and if unsatisfied by that ruling to the Superior Court. 114 C.M.R. 2.25. Normally, an aggrieved party would be required to follow the administrative route prior to seeking relief in court. *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938). Where, however, the challenge to the deduction is based upon grounds available only in bankruptcy proceedings, exhaustion of state law remedies is not required. *In Re Idak Corp.*, 19 B.R. 765 (Bkrtcy.D.Mass. 1982). For the same reason, the Court rejects the contention that these adversary proceedings are an impermissible collateral attack requiring dismissal of these adversary proceedings. The Commonwealth asserts that the rates are binding on the homes unless modified by appeal. The debtors' challenge to the application of the negative equity factor is not a request for redetermination of the allowable reimbursement under state law. A different issue is raised by the request for injunctive relief—whether the deductions are penalties contrary to bankruptcy law. The challenge is limited to a claim that the deductions are unenforceable in bankruptcy, which this Court is competent to determine.

Finally, I reject the Commonwealth's assertion that the debtors have waived their right to contest the negative equity deduction because they have agreed to accept the final rates as set by the commission in the provider contracts. The debtors' agreement to accept the final rates established by the Commission does not preclude the current challenge, which is based solely on bankruptcy law.

REQUEST FOR INJUNCTIVE RELIEF:

The debtors request that the Court enjoin the challenged deductions because they translate into penalties. Claims for penalties are accorded different status under the old Act and the Code. The former Bankruptcy Act specifically disallowed, in full, fines, penalties, or forfeiture claims by a governmental unit which were not compensation for actual pecuniary loss. Bankruptcy Act, Section 57j, 11 U.S.C. Section 93j (repealed October 1, 1979). *See In Re Kline*, 403 F.Supp. 974 (D.Md.1975), aff'd 547 F.2d 823 (4th Cir.1977).

The Bankruptcy Code, in contrast, does not prohibit allowance of such claims. Rather, Section 726(a)(6) recognizes such claims, but subordinates them to a position inferior to all other claims in the order of distribution. 11 U.S.C. Section 726(a)(6) (1979). Initially, however, it appears that the distribution rules of Section 726 are inapplicable in Chapter 11 cases. 11 U.S.C. Section 103(b) (1979). Upon closer examination and analysis, it is my conclusion that claims for penalties should be subordinated in Chapter 11 as well as in Chapter 7 cases. A contrary conclusion would be inconsistent with Section 1129 of the Code. This section requires, as a prerequisite to confirmation of a Chapter 11 plan, that the plan provide creditors, including unsecured claimants, the amount they would receive if the debtor were liquidated under Chapter 7. 11 U.S.C. Section 1129(a)(7)(A)(ii). Thus, if in Chapter 11 cases, penalties were treated on a parity with unsecured claims, the amount of unsecured liabilities would increase, and the proportional dividend to Chapter 11 unsecured creditors would not be equivalent to their distribution in a Chapter 7. If claims for penalties were allowed in Chapter 11, no Chapter 11 plan could be confirmed because creditors would receive more in Chapter 7. Accordingly, under the Code claims for penalties are accorded inferior status in Chapter 11.

Next, it must be determined whether the negative equity deductions are in fact penalties. An obligation is a penalty if "its amount is measured neither by the

obligee's loss nor by the valuation placed by him upon what he has given in exchange." *In Re Caponigri,* 193 F. 291 (S.D.N.Y.1912); *In Re Idak Corp.,* 19 B.R. 765 (Bkrtcy.D. Mass.1982). Where an assessment is not made for the purpose of raising revenue or to compensate for actual lost revenue but rather is to future conduct, it must be considered a penalty. *E.g., United States v. Moore,* 366 F.2d 243 (5th Cir.1966); *In Re Flick,* 5 B.R. 637 (Bkrtcy.E.D.Penn.1980); *In Re Ross Nursing Home,* 2 B.R. 496 (Bkrtcy.E.D.N.Y.1980). The label given the assessment does not control. "... what is in effect a penalty is sometimes adorned with the harmless cloak of a compensation for delay in payment or in the compliance with a contractual duty." *J. Moore, 3 Collier on Bankruptcy,* Par. 57.22 at 388 (14th ed. Supp.1982).

The Commonwealth argues that the purpose of the negative equity deduction is to compensate the state for the increased costs which it must reimburse providers with negative equity capital structure. The conclusion that reduction in rates because of negative equity is compensatory is unsupported by the testimony or documentary evidence. The argument that a home's "negative equity" (as defined by the regulation) leads to higher costs than homes without a "negative equity" is unsupported by any statistical evidence introduced at trial. The state makes the bare allegation that such providers have higher credit costs, but has offered no evidence to support such a finding. Indeed, reimbursement of a provider's costs is denied by means other than application of the negative equity factor. The negative equity assessment is made only after a provider's allowable costs are determined. If a provider pays more than the state's limits for reimbursement for its fixed assets and variable costs, the excess was disallowed. Thus, to the extent a provider paid higher costs than the Commission permits, such costs were not reimbursed. The negative equity provision accomplishes what other regulations have already accomplished.

Another indication that the negative equity was not intended to compensate for increased costs is that it was applied discriminately. The deduction was not made against non-profit homes, which are "notoriously high spenders" according to the Commonwealth's witness. Neither is the negative factor applied to those homes which reached a negative equity position because their variable costs exceeded the Commissions limits. Thus, the Commonwealth's contention that the negative equity provision compensates for higher costs is inconsistent with its practice.

Accordingly, based upon the evidence before me, the inescapable conclusion is that the negative equity factor did not compensate the state for excessive costs claimed by providers and thus was not related to any loss of revenue sustained by the Commonwealth in reimbursing providers. As the purpose of the regulation was to regulate and affect a provider's financial affairs, it is a penalty. *In Re Idak Corp.,* 19 B.R. 765, 775 (Bkrtcy.D.Mass.1982).

The negative equity assessment constitutes a penalty which is not allowable against the Chapter XI debtors and which is subordinated to the claims of unsecured creditors of the Chapter 11 debtors. The approximate one-million two hundred thousand dollar negative equity assessment deducted from the debtors' final rates will have an adverse, if not fatal, impact on the debtors' reorganization. Such deductions will require debtors to immediately cease operations and liquidate under Chapter 7. In furtherance of this determination and pursuant to this Court's equitable power to issue orders appropriate to accomplish the purpose of reorganization, a permanent injunction is hereby issued restraining the enforcement of the negative equity deduction against all the debtors for the years 1976 through 1980.