In re ERLIN MANOR NURSING HOME, INC., and West Side Corporation, et al., Debtors.

Robert GRIFFIN, Katherine Pell and David Telegin, as each is Commissioner of the Rate Setting Commission of the Commonwealth of Massachusetts, and Charles M. Atkins, as he is Commissioner of the Department of Public Welfare of the Commonwealth of Massachusetts, Defendants–Appellants,

v.

WEST SIDE CORPORATION, et al., Plaintiffs–Appellees.

Civ. A. No. 84–764–Z.

United States District Court, D. Massachusetts.

Sept. 25, 1985.

Stephen S. Ostrach, Asst. Atty. Gen., Boston, Mass., for plaintiffs-appellees.

Mark Polebaum, Hale and Dorr, U.S. Trustee's Office, Boston, Mass., for defendants-appellants.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

This is an appeal by certain officials of the Commonwealth of Massachusetts from an order entered by the bankruptcy court in two adversary proceedings. Appellants, defendants in the bankruptcy proceedings, are the three Commissioners of the Massachusetts Rate Setting Commission ("Rate Setting Commissioners") and the Commissioner of the Massachusetts Department of Public Welfare ("Welfare Commissioner"). Appellees, debtors and plaintiffs in the bankruptcy proceedings are six corporations, each of which operates a nursing home and provides long-term care to Medicaid patients. Three of the homes, the "Old Debtors,"[1] filed petitions with the bankruptcy court under Chapter XI of the Bankruptcy Act on September 6, 1979. The other three homes, the "New Debtors,"[2] filed petitions under Chapter 11 of the Bankruptcy Code on December 31, 1981. Appellants challenge the bankruptcy court's order of January 18, 1984 on jurisdictional and substantive grounds.

## FACTS

The Commonwealth and the federal government reimburse the Debtors for care provided to Medicaid patients. The amount of reimbursement is determined through a state rate-setting system, which is described fully in the bankruptcy court's opinion. The essential features of the scheme are that it is cost-based and retrospective in application. At the beginning of each fiscal year, the Commission establishes an interim rate, according to which providers of care are reimbursed monthly. At the end of each calendar year, providers must submit cost reports, and the Commission then sets a final rate for each provider based on its actual costs. *See generally* Mass.Admin.Code tit. 114.2, §§ 2.00–2.18 (1984). The difference between the interim and final rates requires the Commonwealth either to pay to the provider the amount of an underpayment or to recover from the provider an overpayment.

One of the factors in the Commission's rate-setting calculus is the equity position of the provider. After auditing a home's

---

1. The Old Debtors are West Side Corporation, Claflin Hill Corporation, and Houghton Corporation.

2. The New Debtors are Erlin Manor Nursing Home, Inc., St. John's Nursing Home, Inc., and Dartmouth House Nursing Home, Inc.

books and allowing or disallowing various costs, the Commission determines whether the home is in a positive or negative equity position. If its position is positive, it is reimbursed at the full, cost-based rate, but if the home shows a negative position, the rate is adjusted downward according to a formula which factors in the extent of its negative equity position.[3]

■■■ This case involves the final rates for the Debtors for 1977, 1978 and 1979. On July 13, 1983, the Commission issued proposed final rates for these years. These proposed rates included negative equity adjustments for the Debtors totaling over $1.2 million. Facing immediate financial ruin if the rates became final, the Debtors commenced this action asserting that the negative equity adjustment constitutes a penalty under both the Bankruptcy Act and Code[4] and seeking injunctive relief to prevent the final promulgation of the rates.[5] The Commission voluntarily postponed issuance of the final rates pending resolution of the suit. Following an evidentiary hearing, the bankruptcy court, on January 18, 1984, issued a detailed memorandum in which it held that it had jurisdiction over Appellants and the dispute and that the negative equity provisions are a penalty. *In re Erlin Manor Nursing Home, Inc.,* 36 B.R. 672 (Bankr.D.Mass.

1984). It issued the following order: "[T]he Commonwealth of Massachusetts is preliminarily and permanently enjoined from enforcing deductions against the debtors based on the negative equity regulation."

## DISCUSSION

Appellants challenge the jurisdiction of the bankruptcy court on numerous grounds. Chief and broadest among these are its objections to any federal adjudication of these suits because they are barred by the Eleventh Amendment and because the bankruptcy court's order unconstitutionally interferes with state regulation of nursing homes. I will consider these issues in two parts: (1) the purely Eleventh Amendment question of a federal court's power to entertain any suit against these defendants; and (2) the constitutional propriety, under the Eleventh Amendment and general considerations of federalism, of the relief granted by the bankruptcy court in this case.

### I. *The Eleventh Amendment*

The Eleventh Amendment bars an action against a state in federal court unless the state has waived its sovereign immunity or consented to suit. *Edelman v. Jordan,*

---

3. For a detailed discussion of the operation of the negative equity regulation in the rate-setting process, see *Idak Corp. v. Hiam,* 19 B.R. 765, 772–74 (Bankr.D.Mass.1982). The regulation was repealed in 1979 when the Massachusetts Legislature added to the statute authorizing rate-setting for nursing homes the proviso "that the commission shall not cause a decrease in a rate or add a penalty to a rate because such home has an equity position which is less than zero." Mass.Gen.Laws Ann. ch. 6A, § 32 (West Supp.1984) (amended by 1979 Mass.Acts ch. 567). The current regulation still enhances the rate for a home with a positive equity position. Mass.Admin.Code tit. 114.2, § 2.09 (1984).

4. A bankruptcy case commenced before October 1, 1979, the effective date of the Code, continues to be governed by the provisions of the old Act. Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 403, 1978 U.S.Code Cong. & Ad.News (92 Stat.) 2549, 2683 (codified at 11 U.S.C. prec. § 101 (1982)). Thus, the Act governs the Old Debtors' case and the Code applies to the New Debtors.

The treatment of a penalty differs under the Act and the Code. Under the Act, a penalty is

dischargeable in full. 11 U.S.C. § 93(j) (repealed Oct. 1, 1979). Penalties are not fully dischargeable under the Code. 11 U.S.C. § 523(a)(7)(1982). In a Chapter 7 liquidation, however, they would be subordinated to all other classes of claims, except claims for interest accrued during the bankruptcy case. 11 U.S.C. § 726(a)(4)(1982). The bankruptcy court reasoned from Code § 1129 that claims for penalties are accorded a similarly inferior status under Chapter 11. *In re Erlin Manor Nursing Home, Inc.,* 36 B.R. 672, 678 (Bankr.D.Mass. 1984). Appellants have not challenged this conclusion.

5. The instant controversy was joined on August 15, 1983, when the New Debtors filed a complaint and the Old Debtors filed a motion for preliminary injunction. The New Debtors' complaint commenced Adversary Proceeding No. 83–0711–JG. The Old Debtors' motion was filed in an ongoing adversary proceeding commenced on June 3, 1980, with the filing of a complaint by the Old Debtors.

415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). An exception to this bar exists where a state official is alleged to be violating supreme federal law. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Debtors argue that the Eleventh Amendment does not bar this suit both because the Commonwealth has waived its sovereign immunity and because the suit comes within the *Ex parte Young* exception.

▪ The waiver theory provides a sufficient basis for federal jurisdiction in the suit by the New Debtors. Congress, when legislating pursuant to one of its enumerated powers, can abrogate a state's sovereign immunity, provided that it does so explicitly in the text of the statute itself. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (no waiver in Rehabilitation Act of 1973; adding requirement of explicit waiver in statutory language); *see also Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (no waiver in 42 U.S.C. § 1983); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (waiver in Title VII derived from § 5 of Fourteenth Amendment); *Employees v. Missouri Public Health & Welfare Dep't,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) (no waiver in Fair Labor Standards Act); *Parden v. Terminal Ry. Co.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964) (waiver in Federal Employers' Liability Act derived from Commerce Clause). The Bankruptcy Clause, U.S. Const. Art. I, § 8, cl. 4, provides the power for Congress to authorize federal suits against the states, and Congress exercised that power explicitly in the

text of § 106 of the Bankruptcy Code. 11 U.S.C. § 106 (1982).[6] In this case, the federal power established by mandatory Congressional waiver is confirmed by the Commonwealth's consent to suit in initiating adversary proceedings against the New Debtors concerning overpayments in other years. *See Commonwealth of Massachusetts v. Dartmouth House Nursing Home, Inc.,* Civil No. 84–667–Z (D.Mass. Sept. 25, 1985) (appeal of Adversary Proceedings Nos. 82–0155 to 0157 filed Feb. 19, 1982). Thus, waiver under § 106 authorizes this suit by the New Debtors independent of any other theory of jurisdiction.

▪ Because § 106 of the Code does not apply to the Old Debtors' case, federal jurisdiction to hear their action must be found, if anywhere, in the exception established by *Ex parte Young.* In *Ex parte Young,* the Court held that the Minnesota Attorney General was not immune from suit in federal court when his enforcement of a state statute conflicted with the Federal Constitution. Federal suits on this theory have not been limited to cases where a state law ultimately is found to be unconstitutional. In *Edelman v. Jordan,* the plaintiffs' constitutional claim had been decided against them by the district court, 415 U.S. at 679, 94 S.Ct. at 1363 (Douglas, J., dissenting), but the Court saw no bar to granting relief on an *Ex parte Young* theory based on the "pendent" violation of federal statutes and regulations.[7] 415 U.S. at 653 n. 1, 94 S.Ct. at 1351 n. 1. As recently as last year, the Court reaffirmed the principle that "the *Young* doctrine rests on the need to promote the vindication of federal

---

**6.** The Senate Report on § 106 states:

Congress does not ... have the power to waive sovereign immunity completely with respect to claims of a bankrupt estate against a State, though *it may exercise its bankruptcy power through the supremacy clause to prevent or prohibit State action that is contrary to bankruptcy policy.*

S.Rep. No. 989, 95th Cong., 2d Sess. 29, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5815. Although the waiver in subsections (a) and (b) may be limited, § 106(c) has been held to authorize suits affecting future setoffs of Social Security benefit overpayments even when the governmental unit has not filed a proof of

claim. *Lee v. Schweiker,* 739 F.2d 870, 873 (3d Cir.1984); *In the Matter of Neavear,* 674 F.2d 1201, 1203–04 (7th Cir.1982).

**7.** In *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), a case decided on the same day as *Edelman,* the Court noted, but declined to decide the validity of, the theory that every federal-state statutory conflict presents a constitutional question under the Supremacy Clause. 415 U.S. at 533–34 n. 5, 94 S.Ct. at 1377–78 n. 5. The Court instead rested its holding on the view that the federal-state conflict was pendent to a substantial constitutional claim.

rights" and to "hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 910, 79 L.Ed.2d 67 (1984) (quoting *Ex parte Young,* 209 U.S. at 160, 28 S.Ct. at 454).[8]

Congress enacted both the Bankruptcy Act and the Code pursuant to its constitutional power "[t]o establish ... uniform laws on the subject of Bankruptcies throughout the United States." U.S. Const. Art. I, § 8, cl. 4. There can be no question that the Supremacy Clause renders the federal law supreme. U.S. Const. Art. VI, cl. 2. The suit by the Old Debtors, which alleges a violation of supreme federal law, therefore may be maintained against the defendant state officials under the theory of *Ex parte Young.*

## II. *The Bankruptcy Court's Injunction*

■ The relief that may be granted on an *Ex parte Young* theory is limited to prospective injunctive relief running against a state official. *Edelman,* 415 U.S. 651, 94 S.Ct. 1347. The injunction entered by the bankruptcy court in this case clearly exceeds these limitations because it is directed against the "Commonwealth of Massachusetts." This defect, however, is easily cured. If there are present other appropriate parties against whom the relief can be granted, a state may be dismissed as a defendant without affecting the substance of the relief granted, even after judgment has entered. *Florida Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 684 and n. 20, 102 S.Ct. 3304, 3314 and n. 20, 73 L.Ed.2d 1057 (1982). In this case, the bankruptcy court's error was merely tech-

nical because the only defendants under the Old Debtors' complaint and the New Debtors' amended complaint are the three Rate Setting Commissioners and the Welfare Commissioner.[9]

The bankruptcy court's injunction in this case enjoined the Commonwealth "from enforcing deductions against the debtors based on the negative equity regulation." Because of the temporal posture of the case, it has had the effect of preventing the Rate Setting Commissioners from promulgating final rates for the Debtors for 1977, 1978 and 1979. Relying on *Palmer v. Massachusetts,* 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939), and subsequent cases, Appellants argue that this amounts to an unconstitutional interference with state regulatory power. I agree, but only to the extent that the injunction goes beyond what is necessary to protect the legitimate federal bankruptcy interests in this case.

■ To assess the permissible reach of an injunction in this case, it is necessary to define the Debtors' claim carefully and precisely. The Debtors do not assert that Massachusetts's rate-setting system is unconstitutional. Nor do they claim that the negative equity regulation is unconstitutional in its general application to Medicaid providers. They argue only that rate reductions due to the negative equity regulation, as applied to them as debtors under Chapters XI and 11, are subject to particular treatment under the federal bankruptcy laws. Thus, the Debtors do not attack the rate-setting process itself but only its result as it applies to them. Under these circumstances, an injunction that arrests the state's rate-setting mechanism constitutes an excessive federal intrusion upon

---

**8.** In *Pennhurst,* as in *Edelman,* the lower courts had not based the relief granted on federal constitutional grounds. The *Pennhurst* Court distinguished the case before it, where the sole articulated basis for relief was a pendent violation of state law, from *Edelman* and *Ex parte Young,* where compliance with state law meant violation of federal law. 104 S.Ct. at 911. The need to vindicate supreme federal law was lacking in *Pennhurst. Id.* Thus, although the Court held the action barred, it explicitly declined to decide "whether the District Court would have jurisdiction ... to grant prospective relief on

the basis of federal law...." 104 S.Ct. at 910 n. 13.

**9.** The nominal use of the Commonwealth in the New Debtors' case would not be a jurisdictional defect if it were named as a party because jurisdiction under the waiver theory is not limited in the same way as it is under the *Ex parte Young* theory. From this point forward, however, I will discuss the Old and New Debtors' cases together because the federalism argument advanced by Appellants applies equally to a suit under either theory.

the functioning of the state government. The federal interests in this case can be protected fully by less intrusive means.

■ I do not find merit in Appellants' argument that there is no federal jurisdiction because any injunction would interfere with the state's regulatory powers. The situation here is similar to that considered by the Supreme Court in *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). In *Kovacs*, the Court held unanimously that a debtor's financial obligation to constribute to the cleanup of a hazardous waste site under a state court injunction is dischargeable in bankruptcy. Justice O'Connor, concurring, emphasized that the Court's holding "cannot be viewed as hostile to state enforcement of environmental laws." 105 S.Ct. at 712. The essential feature of the Court's reasoning was that once the state had reduced its objective to a monetary obligation, that obligation is subject to the bankruptcy laws. *Id.* at 710–11. Although it distinguished Kovacs's obligation from a fine or penalty, the Court stated that had such a penalty been imposed, it would be subject to treatment under Code § 523(a)(7), the section the New Debtors claim is applicable to them. *Id.* at 711.

The holding in *Kovacs* rests on the distinction under bankruptcy law between actions to enforce state police or regulatory powers, which are not stayed automatically, 11 U.S.C. § 362(b)(4) (1982), and actions to enforce monetary judgments, which are subject to the automatic stay, 11 U.S.C. § 362(b)(5) (1982). 105 S.Ct. at 711 n. 11; *see also Penn Terra Ltd. v. Department of Envtl. Resources*, 733 F.2d 267 (3d Cir. 1984). The distinction is not jurisdictional; it is crucial only in deciding whether the automatic stay is applicable. *Missouri v. United States Bankr. Court*, 647 F.2d 768, 777 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982). But even if the distinction were of jurisdictional significance, Appellants' actions in

this case fall on the opposite side of the fence from the regulatory actions held not to be subject to bankruptcy injunction in the cases they cite. As the bankruptcy court stated, "the monetary assessment [at issue here] is an attempt to regulate the financial structure of the debtors." [10] *In re Erlin Manor Nursing Home, Inc.*, 36 B.R. 672, 677 (Bankr.D.Mass.1984). This is different from attempts to enforce a liquor license suspension, *Colonial Tavern, Inc. v. Byrne*, 420 F.Supp. 44 (D.Mass.1976), or to prevent the operation of a quarry in violation of environmental laws, *In re Canarico Quarries, Inc.*, 466 F.Supp. 1333 (D.P.R.1979).

I therefore hold that the bankruptcy court had jurisdiction to determine whether the negative equity assessments were penalties under federal bankruptcy law and, if they were, to issue an appropriately limited injunction.

### III. *Appellants' Other Jurisdictional Objections*

■ Appellants claim error in the bankruptcy court's rejection of their arguments that it lacked jurisdiction (1) over the New Debtors because the Emergency Rule adopted in this district in response to *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), is invalid; (2) over the Old Debtors because the controversy is beyond the court's summary jurisdiction under the Bankruptcy Act; and (3) over both groups of Debtors because they failed to exhaust state administrative remedies. I find no merit in Appellants' arguments, and I affirm the bankruptcy court for the reasons stated in its memorandum. *In re Erlin Manor Nursing Home, Inc.*, 36 B.R. at 675–77, 678. I also reject Appellants' contention that the Debtors waived their right to present the negative equity issue to the bankruptcy court by continuing to accept benefits under the Medicaid pro-

---

**10.** Appellants advance an anomalous position. When arguing against the court's jurisdiction, they assert that the negative equity assessment constitutes regulation in the interest of public health, safety, and welfare. But in their argument that it is not a penalty, they characterize it as an attempt merely to approximate the expenses associated with a home's negative equity position.

vider agreements. Nothing in the agreements bars the Debtors from asserting and litigating this issue of bankruptcy law.

## IV. *The Penalty Issue*

■ This brings me, at last, to the merits of the case and the question whether the negative equity assessments were penalties under federal bankruptcy law. I find the reasoning of the bankruptcy courts in this case and in *Idak Corp. v. Hiam*, 19 B.R. 765 (Bankr.D.Mass.1982), persuasive on this point. I have considered Appellants' arguments, but they do not convince me that the assessments in fact were intended to compensate the Commonwealth for the Debtors' increased operating costs. I agree with the bankruptcy court that "the purpose of the regulation was to regulate and affect a provider's financial affairs." *In re Erlin Manor Nursing Home, Inc.*, 36 B.R. at 679. Accordingly, I affirm the bankruptcy court's decision on the merits. The injunction will be modified to enjoin the Commissioner of the Department of Public Welfare for the Commonwealth of Massachusetts from reducing any future reimbursement payment to the debtor corporations by any amount attributable to the operation of the Commonwealth's negative equity regulations in calculating the final reimbursement rates for Debtors covering the years 1977, 1978 and 1979.[11]

## CONCLUSION

For the foregoing reasons, the bankruptcy court's exercise of jurisdiction and its decision of the penalty issue are affirmed. An injunction, modified in accordance with this memorandum, will issue.

---

**11.** This modification brings the injunction in these cases into harmony with the injunction I have affirmed today in *Commonwealth of Mas-*sachusetts v. Dartmouth House Nursing Home, Inc.,* Civil No. 84–667–Z (D.Mass. Sept. 25, 1985).